# United States Court of Appeals

## For the First Circuit

No. 01-2732

EILEEN CROWLEY,

Plaintiff, Appellee,

v.

L.L. BEAN, INC.,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MAINE

[Hon. Gene Carter, U.S. District Judge]

Before

Selya, Circuit Judge,

Gibson* and Greenberg,** Senior Circuit Judges.

Peter J. Brann with whom Daniel A. Nuzzi, Kevin J. Beal and Brann & Isaacson were on brief for appellant.
Rebecca S.K. Webber with whom Linnell, Choate & Webber were on brief for appellee.
Julie L. Gantz with whom Nicholas M. Inzeo, Acting Deputy General Counsel, Philip B. Sklover, Associate General Counsel, Vincent J. Blackwood, Assistant General Counsel, and Susan L.P. Starr were on brief for amicus curiae Equal Employment Opportunity Commission.

September 19, 2002

_____

*Of the Eighth Circuit, sitting by designation.
**Of the Third Circuit, sitting by designation.

**GREENBERG**, <u>Circuit Judge</u>.  This matter comes on before this court on defendant-appellant L.L. Bean's appeal from the district court's order entered November 8, 2001, denying its motion for judgment as a matter of law or, in the alternative, for a new trial.  For the reasons stated herein, we affirm the order of the district court and uphold the jury verdict in favor of plaintiff-appellee Eileen Crowley.

## I.  BACKGROUND

We briefly describe the facts at the outset, but discuss them in greater detail where applicable and essential to explain our determinations.  Since 1992, Crowley has worked for L.L. Bean, a major catalog retailer based in Freeport, Maine, specializing in outdoor apparel and merchandise.  In 1996, she began working as an "order picker operator" in L.L. Bean's warehouses and in this capacity drove 22,000-pound forklift-like machines called transtackers that collect merchandise for packing and shifting.  Crowley claims that from 1996 until July 1998, her co-worker, Paul Juhl, stalked and harassed her.

Evidence at trial supported a conclusion that during the period involved, Juhl engaged in disturbing and sometimes peculiar behavior around Crowley, including grabbing her foot and massaging it against her will at an L.L. Bean pool party, continually following her at work even when they were not scheduled to work in the same warehouse, physically blocking her path and thereby forcing her to squeeze by him, giving her gifts designed to let her know that he was watching her, dancing in the aisles near her,

waiting in the dark for her to come upon him, following her home, and even breaking into her house.  Crowley reported most of these incidents to her team leaders or supervisors, but she claims that L.L. Bean did not take timely effective action to protect her from Juhl and therefore maintained a hostile work environment.  L.L. Bean finally terminated Juhl's employment, but did so only after Crowley obtained a permanent court protection order against Juhl in July 1998.

On December 21, 1998, Crowley filed a complaint with the Equal Employment Opportunity Commission ("EEOC") and the Maine Human Rights Commission, claiming that L.L. Bean had engaged in sex discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e et seq., and the Maine Human Rights Act, Me. Rev. Stat. Ann. tit. 5, § 4572 (West 2002).  After the EEOC issued a right-to-sue letter and the Maine Human Rights Commission determined that L.L. Bean had not engaged in either sex discrimination or retaliation, Crowley filed her complaint in the district court on June 22, 2000, asserting that L.L. Bean had engaged in sex discrimination in violation of Title VII and the Maine Human Rights Act predicated on her assertion that she had been subjected to a hostile work environment.

The jury trial began on June 5, 2001, and concluded on June 11, 2001.[1]  L.L. Bean moved for judgment as a matter of law

---

[1]L.L. Bean unsuccessfully moved for summary judgment before the trial.  See Crowley v. L.L. Bean, Inc., 143 F. Supp. 2d 38 (D.

pursuant to Fed. R. Civ. P. 50 at the conclusion of Crowley's case-in-chief and renewed the motion after both parties rested. Before submitting the case to the jury, the court partially granted the motion but only as to Crowley's claim for punitive damages under the Maine Human Rights Act.

After one day of deliberations, the jury returned its verdict on June 13, 2001, finding that L.L. Bean had violated Title VII by sexually discriminating against Crowley through acts occurring on or after February 24, 1998. The February 24, 1998 date was critical because Crowley filed her EEOC claim 300 days after that date and she was required to file the charge within the 300-day period for it to be timely.[2] The jury also found that the unlawful discrimination was the result of a systemic violation, but not of a serial violation. The jury found, however, that L.L. Bean had not violated the Maine Human Rights Act by sexually discriminating against Crowley through acts occurring on or after June 22, 1998. The June 22, 1998 date was applicable because the Maine Human Rights Act has a two-year statute of limitations, and Crowley initiated this action on June 22, 2000. See Me. Rev. Stat. Ann. tit. 5, § 4613(2)(C) (West 2002). Finally, the jury awarded

---

Me. 2001).

[2]The 300-day period was applicable because Maine has an entity with the authority to grant or seek relief with respect to an alleged unlawful employment practice. See National R.R. Passenger Corp. v. Morgan, --- U.S. ---, 122 S. Ct. 2061, 2070 (2002).

Crowley $215,000 in compensatory damages, but denied her any punitive damages.

On June 26, 2001, L.L. Bean filed a renewed motion for judgment as a matter of law or, in the alternative, for a new trial pursuant to Fed. R. Civ. P. 50 and 59. On November 8, 2001, the district court denied the motion and entered an amended final judgment. On December 3, 2001, L.L. Bean filed a notice of appeal.

## II. JURISDICTION AND STANDARD OF REVIEW

### A. Jurisdiction

The district court had jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343, and 1367, and we have jurisdiction over this appeal pursuant to 28 U.S.C. § 1291.

### B. Standard of Review

To the extent that L.L. Bean appeals from the district court's denial of its motion for judgment as a matter of law, our review of the district court's ruling is plenary, and we must apply the same standard that the district court applied in considering the motion. See Mangla v. Brown Univ., 135 F.3d 80, 82 (1st Cir. 1998). Accordingly, we must "view the evidence in the light most favorable to [Crowley], drawing all reasonable inferences in [her] favor." McMillan v. Mass. Soc'y for the Prevention of Cruelty to Animals, 140 F.3d 288, 299 (1st Cir. 1998) (internal quotation marks omitted). Moreover, we must "resolve all credibility issues in favor of the verdict." United States v. Scharon, 187 F.3d 17, 21 (1st Cir. 1999).

Our review, however, "is weighted toward preservation of the jury verdict," for "we must affirm unless the evidence was so strongly and overwhelmingly inconsistent with the verdicts that no reasonable jury could have returned them." Rodowicz v. Mass. Mut. Life Ins. Co., 279 F.3d 36, 41-42 (1st Cir. 2002) (internal quotation marks and brackets omitted); see also White v. N.H. Dep't of Corr., 221 F.3d 254, 259 (1st Cir. 2000) ("Once a jury returns a verdict, a 'heavy burden' is placed on one who challenges it."). Indeed, we should "not set aside a jury verdict as a matter of law unless there was only one conclusion the jury could have reached," McMillan, 140 F.3d at 299, and that result was contrary to the verdict, see White, 221 F.3d at 259 ("We may reverse only if a reasonable person could not have reached the conclusion of the jury.").

L.L. Bean argues that in the event that we do not grant it judgment as a matter of law, we should grant it a new trial based on juror bias, erroneous evidentiary rulings, and improper jury instructions. L.L. Bean's motion for a new trial in the district court predicated on juror bias was "committed to the discretion of [the] district court." McDonough Power Equip., Inc. v. Greenwood, 464 U.S. 548, 556, 104 S. Ct. 845, 850 (1984). Therefore, "[i]n reviewing the district court's denial of appellant['s] request for a new trial, we . . . consider only whether the district court abused its discretion." Dall v. Coffin, 970 F.2d 964, 969 (1st Cir. 1992).

We review L.L. Bean's challenge of the district court's rulings to exclude or admit testimony primarily on an abuse-of-discretion basis. See Cummings v. Standard Register Co., 265 F.3d 56, 62 (1st Cir. 2001); see also United States v. Sposito, 106 F.3d 1042, 1046 (1st Cir. 1997) ("The proper interpretation of the Federal Rules of Evidence is a question of law and is reviewed de novo, but the application of [a rule] . . . is reviewed under an abuse-of-discretion standard.") (citations omitted); United States v. Paulino, 13 F.3d 20, 25 (1st Cir. 1994) ("The court of appeals reviews a trial judge's admission of evidence over a hearsay objection only for abuse of discretion."); Alexis v. McDonald's Rests. of Mass., Inc., 67 F.3d 341, 347 (1st Cir. 1995) ("Rulings on the admissibility of lay opinion testimony are reviewed only for manifest abuse of discretion.") (internal quotation marks omitted). Thus, we should reverse the district court's ruling "if we determine that the judge 'committed a meaningful error in judgment.'" Ruiz-Troche v. Pepsi Cola of P.R. Bottling Co., 161 F.3d 77, 83 (1st Cir. 1998) (quoting Anderson v. Cryovac, Inc., 862 F.2d 910, 923 (1st Cir. 1988)).

Finally, we review de novo L.L. Bean's contention that the district court erroneously instructed the jury on the law relating to systemic violations. See Romano v. U-Haul Int'l, 233 F.3d 655, 665 (1st Cir. 2000), cert. denied, 122 S. Ct. 41 (2001). "[T]he giving of [a jury] instruction is reversible error only if it (1) was misleading, unduly complicating, or incorrect as a

matter of law, and (2) adversely affected the objecting party's substantial rights."  Rodowicz, 279 F.3d at 42.


III.  DISCUSSION

A. Judgment as a Matter of Law

L.L. Bean challenges the jury verdict as to both Crowley's hostile work environment claim and her systemic sex discrimination claim.  It contends that Crowley failed to present sufficient evidence to support either of the jury's findings. Crowley argues, however, that L.L. Bean has not met its demanding burden of demonstrating that no reasonable jury, presented with the evidence adduced at trial, could have found L.L. Bean liable for maintaining a hostile work environment and committing a systemic violation.

1. Hostile Work Environment Claim

Title VII of the Civil Rights Act of 1964 provides, in relevant part, that "[i]t shall be an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).  The Supreme Court has stated that "'[t]he phrase "terms, conditions, or privileges of employment" evinces a congressional intent to strike at the entire spectrum of disparate treatment of men and women in employment,' which includes requiring people to work in a discriminatorily hostile or abusive environment."  Harris v.

-8-

<u>Forklift Sys.</u>, 510 U.S. 17, 21, 114 S. Ct. 367, 370 (1993) (some internal quotation marks omitted) (quoting <u>Meritor Sav. Bank, FSB</u> v. <u>Vinson</u>, 477 U.S. 57, 64, 106 S. Ct. 2399, 2404 (1986)). "When the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, Title VII is violated." <u>Oncale</u> v. <u>Sundowner Offshore Servs.</u>, 523 U.S. 75, 78, 118 S. Ct. 998, 1001 (1998) (internal quotation marks omitted) (quoting <u>Harris</u>, 510 U.S. at 21, 114 S. Ct. at 370).

To prove a claim of hostile work environment sexual harassment, a plaintiff must establish:

> (1) that she (or he) is a member of a protected class; (2) that she was subjected to unwelcome sexual harassment; (3) that the harassment was based upon sex; (4) that the harassment was sufficiently severe or pervasive so as to alter the conditions of plaintiff's employment and create an abusive work environment; (5) that sexually objectionable conduct was both objectively and subjectively offensive, such that a reasonable person would find it hostile or abusive and the victim in fact did perceive it to be so; and (6) that some basis for employer liability has been established.

<u>O'Rourke</u> v. <u>City of Providence</u>, 235 F.3d 713, 728 (1st Cir. 2001). L.L. Bean asserts that Crowley presented insufficient evidence at trial to satisfy three elements of her hostile work environment claim -- namely, that Crowley perceived Juhl's behavior as "subjectively abusive," that Juhl's conduct was "severe and pervasive," and that L.L. Bean knew or should have known about

-9-

Juhl's alleged harassment, but failed to take prompt or appropriate action to remedy the situation. Br. of Appellant at 18-31.

Before addressing the specifics of each claim, however, it is important to point out that L.L. Bean predicates its argument on two critical suppositions: (1) Title VII's administrative filing requirements precluded the jury from considering allegations of harassment that occurred before February 24, 1998; and (2) the jury's verdict on the state law claim established that Crowley was not harassed after June 22, 1998. Thus, L.L. Bean effectively seeks to cabin Crowley's claim to the end that it is based only on events occurring during a four-month period. L.L. Bean then argues that the "handful of incidents" that occurred during that four-month period between February 24, 1998, and June 22, 1998, are insufficient to support the jury's verdict. Br. of Appellant at 6.

The Supreme Court's recent decision in National Railroad Passenger Corp. v. Morgan, --- U.S. ---, 122 S. Ct. 2061 (2002), severely undermines L.L. Bean's argument. In Morgan, the Court held that "consideration of the entire scope of a hostile work environment claim, including behavior alleged outside the statutory time period, is permissible for the purposes of assessing liability, so long as any act contributing to that hostile environment takes place within the statutory time period." Id. at ---, 122 S. Ct. at 2068. The Court explained that a "hostile work environment claim is comprised of a series of separate acts that collectively constitute one 'unlawful employment practice.'" Id. at

---, 122 S. Ct. at 2074. Thus, "[p]rovided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by the court for the purposes of determining liability." Id.

Therefore, in the wake of Morgan, the jury not only could consider Juhl's conduct prior to February 24, 1998, as "relevant background evidence," United Air Lines, Inc. v. Evans, 431 U.S. 553, 558, 97 S. Ct. 1885, 1889 (1977), but also could hold L.L. Bean liable for the alleged acts of harassment that fell outside the 300-day period for filing an EEOC charge of sexual discrimination provided that it found that there was an act contributing to the hostile environment within the 300-day filing period.[3] Notwithstanding the thrust of L.L. Bean's argument that Crowley's allegations of harassment included only "a few brief encounters" between her and Juhl that were "scarcely threatening," Br. of Appellant at 24, 31, Crowley offered evidence at trial establishing that Juhl's harassment began in the fall of 1996 and continued into July 1998, and thus L.L. Bean's argument is flawed. Consequently, we must review all such evidence offered at trial when determining whether the jury verdict is supported by the evidence.

As we have indicated, L.L. Bean also asserts that we must disregard any evidence of sexual harassment on or after June 22, 1998, because the jury found that it had not violated the Maine

---

[3]The parties agree that the 300-day filing period was applicable here with regard to the Title VII claim.

-11-

Human Rights Act by sexually discriminating against her by acts occurring on or after that date. Although this evidence appears to be of limited significance inasmuch as Crowley alleges only a few incidents of alleged harassment by Juhl after June 22, 1998, L.L. Bean is wrong on this point, too. In basing its argument on the portion of the jury's verdict that L.L. Bean had not sexually discriminated against Crowley on or after June 22, 1998, L.L. Bean assumes that the jury concluded that the hostile work environment ceased to exist on June 22, 1998.

But the jury's determination that L.L. Bean was not liable for maintaining a hostile work environment under the state statute based solely on incidents that occurred on or after June 22 does not mean that the jury was -- and, therefore, this court is -- precluded from considering any evidence relating to Juhl's post-June 22 conduct when determining L.L. Bean's liability under Title VII. As Crowley argues in her brief, "[t]he fact that the number of incidents from June 23 forward do not constitute a violation of state law by themselves has no logical connection to whether those incidents can be considered, together with earlier incidents, under federal law." Br. of Appellee at 17.

Moreover, L.L. Bean draws too many conclusions from the jury's verdict. For instance, the jury may have found for L.L. Bean on the state law claim because it concluded that Crowley had not satisfied the employer liability element of the hostile work environment claim (perhaps because it decided that L.L. Bean finally took appropriate remedial measures to end the hostile work

-12-

environment on or after June 22, 1998), not because the jury believed that Crowley failed to prove that Juhl's conduct on or after June 22, 1998, was "severe or pervasive." In other words, the jury may have believed that Crowley was subject to a hostile work environment on or after June 22, 1998, but that L.L. Bean nevertheless should not be held liable for Juhl's conduct on or after that date. Because we have no way of knowing the jury's reason for rendering its verdict on the state law claim, L.L. Bean's argument that we cannot consider evidence relating to events on or after June 22, 1998, must fail. Therefore, we will consider all of the evidence offered at trial regarding Juhl's harassment from the fall of 1996 through July of 1998 in determining whether the evidence supports the jury's verdict that L.L. Bean maintained a hostile work environment.

### a. Subjectively Abusive

L.L. Bean first argues that the jury's verdict should be overturned because Crowley did not offer any evidence demonstrating that Juhl's conduct was "subjectively abusive." It asserts that "[s]ince Crowley did not believe that Juhl was sexually harassing her until June 23, 1998, . . . Crowley did not subjectively believe that she was being subjected to a hostile work environment during the statutory period." Br. of Appellant at 19 (citations to the record omitted). L.L. Bean seizes on the June 23, 1998 date because Crowley testified that until that date, she thought the team leaders adequately were taking care of the Juhl situation and therefore she had no complaints regarding what L.L. Bean was doing.

-13-

We reject this argument, as L.L. Bean misapprehends what Crowley was required to "subjectively perceive." As Crowley points out in her brief, although the victim must subjectively perceive the harasser's conduct to be "hostile or abusive," the victim need not subjectively believe that the conduct met the legal definition of unlawful sexual harassment. See Br. of Appellee at 14. At trial, Crowley testified that she was frightened and feared for her safety because Juhl was stalking her. See Tr. 94, 109 (she was "scared"); 93 (she "was scared to death"); 123, 127, 131 (she was "shaking"); 127 (she "was breaking down"); 130 (she "felt real shaky inside"); 146 (she was "[r]eally upset"); 135 (she "felt like [she] was going to get hurt"). Furthermore, Crowley offered into evidence a copy of L.L. Bean's written warning to Juhl, in which it informed Juhl that he has "created a hostile environment in which [Crowley] felt physically threatened." App. 99.

Therefore, although Crowley may not have realized until June 1998 that Juhl's conduct actually constituted sexual harassment, she did present evidence establishing that she earlier considered Juhl's behavior threatening and hostile. Consequently, contrary to L.L. Bean's assertion, Crowley presented sufficient evidence for a rational jury to find that she perceived Juhl's conduct to be "hostile or abusive."

### b. Severe or Pervasive

L.L. Bean next argues that Crowley's "eight encounters" with Juhl during the four-month period were not objectively "severe and pervasive" enough to create a hostile work environment,

-14-

insisting that Crowley's allegations "'are so trivial, so isolated, and so far from the paradigmatic case of sexual harassment' that judgment as a matter of law is 'clearly appropriate.'" Br. of Appellant at 20-21 (quoting Hartsell v. Duplex Prod., Inc., 123 F.3d 766, 773 (4th Cir. 1997)). L.L. Bean contends that Crowley's hostile work environment claim is supported merely by

> evidence that Juhl gave her a book, came to the wrong building where she was working on three occasions, operated his machine in her vicinity on occasion (and told her once 'it will cost you' when she asked him to move), and came out of a tunnel dancing on one occasion.

Reply Br. of Appellant at 9. As we explained above, Morgan fatally undermines this argument, for Crowley's allegations do not merely include eight incidents, but involve alleged acts of harassment and stalking that spanned nearly one and a half years. Accordingly, we will review evidence relating to all of Crowley's allegations -- not just those of acts that occurred between February 24, 1998, and June 22, 1998 -- to determine whether Juhl's conduct was sufficiently "severe or pervasive" to constitute actionable harassment.

Crowley presented the following evidence to support her hostile work environment claim. In 1996, at an L.L. Bean pool party, Juhl grabbed her foot and massaged it against her will. He told her that she was the "perfect woman" and that she had "perfect women's feet." Juhl also gave Crowley gifts intended to let her know that he was watching her both at and outside of work. He even followed her home one evening by turning off his headlights and

pursuing her car in the dark. At an L.L. Bean party in December 1996, he again stated that Crowley was the perfect woman and pinpointed the exact location of her house on a map, letting her know that he knew exactly where she lived. Crowley reported these incidents to her team leader, David Baker.

In January 1997, Juhl followed Crowley at work and bothered her, sometimes lurking in the dark outside the women's bathroom while he waited for her to emerge. He often parked next to her car in the parking lot and followed her to her car when she was leaving work. He also used L.L. Bean's hand-held computer units to track Crowley's movement within the warehouse. Juhl frequently blocked her in the aisles and forced her to squeeze by him. Crowley reported all of these incidents to her supervisor, Tim Marong, who remarked that Juhl was stalking her.

On February 16, 1997, Juhl broke into Crowley's home while she was there. He tried to get her to touch his clothing, and he grabbed her wrists in an attempt to bring her upstairs with him. He not only told her that he wanted to date her, but admitted that he had been at her house previously and described what outfits she had been wearing on those occasions. Crowley explained that she had a boyfriend, but Juhl responded, "but he's never here." After he finally left, Crowley saw him outside peering in different windows of her house. She hid in the bathroom until he left.

As she had done previously, Crowley reported this incident to her supervisors. She told her team leaders, her supervisor Tim Marong, and L.L. Bean's Human Resources personnel

that she believed she was being stalked. Indeed, Marong testified that he thought that Juhl's conduct could have constituted sexual harassment. Marong contacted Pat Bressette-Long, a Human Resources supervisor, who met with Crowley several weeks later. Crowley informed Bressette-Long not only about Juhl's uninvited entry into her home, but also about his intimidating behavior at work. When Crowley asked whether she should notify the plant manager, Frank Johnson, about Juhl's conduct, Bressette-Long advised her not to break the chain of command, but to continue reporting her complaints to her immediate supervisor. One month after Crowley met with Bressette-Long, Juhl was reassigned to a separate work area.

From March 1997 until the summer of 1997, Juhl continued to work near Crowley, even when he was scheduled to work elsewhere. He also continued his familiar conduct of blocking her in the aisles with his transtacker and dancing near her. She reported Juhl's disturbing and sometimes bizarre behavior to her team leader and Human Resources, which assured her that Juhl would be scheduled to work in a different warehouse. Despite these assurances, however, in May 1997, L.L. Bean permitted Juhl to volunteer to work shifts in her warehouse.

During the summer of 1997, Juhl's conduct did not change, as he kept trying to be near Crowley. He not only continued to corner her and make her ask him to move out of the way, but also began hiding in dark areas of the warehouse where Crowley would come upon him. Crowley notified her team leader, Leo Davis, about

Juhl's conduct, but he did nothing, even though he promised to investigate the matter. Meanwhile, Juhl's behavior continued unabated. In July 1997, he appeared unexpectedly in her work area 15 or more times, lingered around the time clock at the end of Crowley's shift, and stood close to her on numerous occasions.

During the fall and early winter of 1997, Crowley saw Juhl so often in her work area that she assumed that they were working the same shift. She later learned that Juhl actually was working the wrong shift with management's knowledge. Co-workers also noticed Juhl's conduct, prompting one witness to remark, "Wherever she was, he was." In fact, one L.L. Bean witness testified that he believed Juhl was sexually attracted to Crowley, explaining that "it was kind of obvious the way he handled himself."

In January 1998, Crowley briefly was assigned to work an 8:00 a.m.-4:30 p.m. shift and therefore maintained little contact with Juhl. This respite was short-lived, however, for L.L. Bean soon placed her back on the third shift with Juhl. She notified her supervisor, Bob Anderson, that she was scared and asked for a parking space closer to the building so that she would not be alone with Juhl. Anderson stated that he was aware of her problems with Juhl, but that he had to put her back on Juhl's shift for business reasons.

In February 1998, Juhl's contact with Crowley intensified. He gave her a book on holistic cancer therapy after her friend's mother died of cancer. Crowley maintains that Juhl

could have known about the death of her friend's mother only by following Crowley. Crowley told her team leaders about the incident and reported that he had grabbed her hands when he tried to give her the book. Juhl also drove his transtacker up and down the aisle, shadowing her movements in the adjacent aisle, and used his transtacker to block her in aisles. Crowley reported these incidents to her team leaders, David Baker and Steve McCourt, who assured her that L.L. Bean was taking her concerns seriously.

In March 1998, L.L. Bean consolidated the first and third shifts of its distributions operation and consequently transferred Juhl to the morning shift. Despite being assigned to a different building, Juhl showed up at Crowley's building on March 30 and 31, and April 1, 1998. As one co-worker testified, Juhl "would constantly show up in the wrong building" during March and April 1998, and "was constantly following her all the time, he never stopped."

In April 1998, Juhl continued showing up in Crowley's work area, following her, and physically obstructing her from doing her work. One time, he danced in the aisle in front of her. Another time, he prevented her from passing, and when she asked him to let her by, he responded that it would "cost her." When Crowley reported these incidents to her new team leader, Peter Farley, he joked about Juhl's conduct and referred to him as her "little stalker."

From April until June 1998, Crowley's interaction with Juhl was limited, as the two worked on different shifts. Juhl

-19-

nevertheless loitered around the time clock and the warehouse entrance, waiting for Crowley to come and go. On June 22, 1998, Juhl was returned to Crowley's shift. Shortly thereafter, Juhl lapsed back into his familiar pattern of behavior, blocking her in the aisles, making her beg him to move, and forcing her to squeeze by him.

On June 23, 1998, a team leader, Leo Davis, witnessed Juhl blocking Crowley, but did nothing. Instead, Davis laughed with Juhl in front of Crowley and then looked at her, smiled, and left. Furthermore, Ken Libby, a fellow employee, warned supervisor Anderson that Crowley would end up dead if someone did not do something to stop Juhl. In addition, Bennett Schlaack, a trainer, advised three team leaders -- John Andretta, Steve McCourt, and David Baker -- that Juhl was shadowing Crowley and that he was concerned for her safety. L.L. Bean, however, took no action. Frustrated with L.L. Bean's ineffectiveness in protecting her from Juhl, Crowley went to the police a few days after Davis saw Juhl block Crowley.

In the meantime, Leo Davis was assigned to investigate a confrontation between Crowley and Juhl that occurred on the same day that Davis witnessed Juhl blocking Crowley. Aside from Davis, two other employees witnessed the incident and reported the matter to management. Crowley explained to Davis that Juhl's conduct was longstanding, but Davis indicated to her that L.L. Bean "had to protect Paul's rights." During the course of Davis's investigation, Crowley was restricted to the dock area, while Juhl

enjoyed full access to the warehouse. Notwithstanding Crowley's complaints, management made no effort to keep Juhl away from Crowley.

On June 30, 1998, L.L. Bean issued a written warning to Juhl, stating that he had "created a hostile work environment in which [Crowley] felt physically threatened" and that his "threatening, intimidating behavior will not be tolerated." The warning indicated that Juhl "must take action to avoid further contact with Eileen Crowley." The Human Resources official who issued the warning, Rebecca Batchelder, testified that she did not know that L.L. Bean already had issued a directive in the spring of 1997 requiring that Juhl and Crowley work in separate buildings.

During Davis's investigation when Crowley and Juhl were separated at work and even after Juhl received his written warning instructing him to stay away from Crowley, Juhl continued following Crowley around at work. Sometime after June 24, 1998, Crowley again complained to her team leader, Peter Farley, that Juhl was violating the standing order that he and Crowley be kept separated, but Farley took no action other than to suggest that Crowley have her boyfriend give Juhl a "blanket party." On July 7, 1998, after Farley again allowed Juhl and Crowley to work in the same area, Crowley returned to the police department and obtained a temporary protection order against Juhl. The police served Juhl with the order at work on the same day.

Thereafter, L.L. Bean placed Juhl on paid leave pending the court hearing on Crowley's request for a protection order. On

July 17, 1998, Crowley obtained a permanent court protection order against Juhl.  On July 24, 1998, L.L. Bean terminated Juhl's employment.

As is quite evident, Crowley presented evidence relating to more than just eight innocuous encounters between her and Juhl. In fact, she provided ample evidence to establish that Juhl engaged in a longstanding pattern of hostile and intimidating behavior towards her that spanned over one and a half years.  To prevail on this appeal, L.L. Bean must demonstrate that no reasonable person could have reached the conclusion of the jury, even after viewing all of the evidence in the light most favorable to the verdict. Based on the evidence adduced at trial, it cannot be said that a reasonable person could not have concluded that Juhl's conduct towards Crowley was "severe or pervasive."  Indeed, as the EEOC wrote in its amicus brief, "by focusing only on the specific incidents which occurred after February 24, Bean fails to capture the residual and cumulative effect that Juhl's campaign of harassment had on Crowley's working conditions even on days when she did not encounter him."  Amicus Br. of EEOC at 21. Consequently, Crowley presented sufficient evidence at trial to satisfy this element of her hostile work environment claim.

### c. Employer Liability

L.L. Bean finally argues with respect to the hostile work environment claim that Crowley failed to offer sufficient evidence to establish employer liability.  Although this appears to be L.L. Bean's best argument to the extent that it challenges the

sufficiency of the evidence to support the verdict, it nevertheless is unable to meet the onerous burden of proving that a reasonable person could not have concluded that, after it learned of Juhl's behavior, it failed to take appropriate steps to stop Juhl's harassment and stalking of Crowley.

A plaintiff must satisfy different standards for establishing employer liability in a hostile work environment case depending on whether the harasser is a supervisor or co-employee of the victim. In this case, it is beyond dispute that Juhl and Crowley were co-employees. To establish employer liability for a non-supervisory co-employee, a plaintiff must demonstrate that the employer "'knew or should have known of the charged sexual harassment and failed to implement prompt and appropriate action.'" White, 221 F.3d at 261 (quoting Blankenship v. Parke Care Ctrs., Inc., 123 F.3d 868, 872 (6th Cir. 1997)). L.L. Bean maintains that Crowley did not present sufficient evidence to satisfy either prong.

### i. Whether L.L. Bean Knew or Should Have Known

The evidence offered at trial, if viewed in the light most favorable to Crowley, clearly supports a jury finding that L.L. Bean knew or should have known that Juhl was harassing and stalking Crowley. L.L. Bean bases its misguided argument to the contrary on its restricted temporal view of the evidence, but as we explained above, the statute of limitations did not preclude the jury -- and therefore does not preclude us -- from considering evidence relating to harassment before February 24, 1998, and the

-23-

jury verdict on the state law claim does not preclude us from considering evidence relating to harassment on or after June 22, 1998. Therefore, we must consider all of the evidence, from 1996 until July 1998, to determine whether it was sufficient to support a jury finding that L.L. Bean knew about Juhl's conduct.

Crowley presented ample evidence that she reported Juhl's behavior to her team leaders, supervisors, and Human Resources. Crowley began notifying her supervisors of Juhl's disturbing behavior in 1996, when she informed her team leader, David Baker, that Juhl was harassing and following her both on and off L.L. Bean's premises. In January 1997, she told her team leader, John Andretta, and her supervisor, Tim Marong, that Juhl was bothering her at work, tracking her movements with the hand-held computers, waiting for her in the dark outside the women's bathroom, blocking her in the aisles with his transtacker, and forcing her to squeeze by him. After Juhl broke into her home in February 1997, she reported the incident to team leaders Andretta and Steve McCourt, supervisor Marong, and Human Resources.

In the spring of 1997, Crowley advised her new team leader, Baker, that Juhl was continuing to show up in her building and block her in the aisles. In April and May 1997, after Crowley twice told Human Resources about Juhl's stalking behavior, Human Resources assured her Juhl would be scheduled for work in a different warehouse.

In the summer of 1997, Crowley notified her team leader, Leo Davis, that Juhl always was trying to be near her and that he

-24-

hid in the dark, waiting for her to come upon him. In September 1997, she told her team leader, Keith Menard, that Juhl was showing up repeatedly in her work area, even though he was working a different shift.

In January 1998, after being put back on the first shift with Juhl, Crowley informed her supervisor, Bob Anderson, that she was scared of Juhl and had concerns about working on the same shift with him. In February 1998, Crowley reported to her team leaders, Baker and McCourt, that Juhl was shadowing her movements in his transtacker. During L.L. Bean's shift consolidation in March 1998, Crowley complained to Baker that Juhl had come to the wrong building three days in a row.

In April 1998, Crowley told her new team leader, Peter Farley, that Juhl was physically blocking her from doing her work, but Farley laughed about Juhl's behavior and referred to him as her "little stalker." In late June 1998, Crowley again complained to Farley that Juhl was violating the standing directive that he and Crowley be kept separated at work, but Farley did nothing to remedy the situation. In July 1998, after Juhl was issued a written warning requiring him to stay away from Crowley but before L.L. Bean placed him on unpaid leave, Farley allowed Juhl to work in Crowley's vicinity despite her previous complaints.

In addition to Crowley's repeated complaints to her team leaders and supervisors about Juhl's conduct, Crowley's co-workers also reported Juhl's behavior and expressed their concerns for her safety. See, e.g., Sims v. Health Midwest Physicians Servs. Corp.,

196 F.3d 915, 921 (8th Cir. 1999) ("Notification of sexual harassment to an employer need not come solely from the victim of the harassment for knowledge to be imputed to the employer."). For instance, Ken Libby, a fellow employee, warned supervisor Anderson that Crowley would end up dead if someone did not do something to stop Juhl. Another fellow employee, Alan Coffin, alerted Anderson to Juhl's odd practice of dancing near Crowley. In addition, Bennett Schlaack, a trainer, advised three team leaders -- Andretta, McCourt, and Baker -- that Juhl was shadowing Crowley and that he was concerned for her safety.

Furthermore, Crowley presented evidence that L.L. Bean managers, team leaders, and supervisors were aware of Juhl's conduct and that at times they even characterized it as harassment. For example, after Juhl broke into Crowley's home in February 1997, Crowley spoke with both her supervisor, Tim Marong, and a Human Resources supervisor, Pat Bressette-Long. Marong's memo notes that Crowley "felt that Paul was stalking her," and Bressette-Long's hand-written notes state that "Eileen Crowley feels like she is being stalked." The Security Department investigated a complaint Crowley advanced in May 1997 and described her grievance as a "sexual harassment complaint" in a document distributed to "management" -- specifically, to manager Tim Parker. After Crowley asked her supervisor, Bob Anderson, to put her back on the first shift in January 1998 because she was concerned about Juhl, Anderson sent an email to other management personnel stating that everyone was fully aware of the situation between Crowley and Juhl.

-26-

Crowley's team leader, John Andretta, testified at trial that "it was obvious everybody knew of the Juhl/Eileen situation and how he was following her around, always being where she was." Finally, the written warning to Juhl on June 30, 1998, indicated that he had "created a hostile work environment in which [Crowley] felt physically threatened" and that his "threatening, intimidating behavior will not be tolerated."

At bottom, L.L. Bean's contention that Crowley did not properly notify management of her complaints because she "bypass[ed] the reporting requirements under L.L. Bean's harassment policies," Br. of Appellant at 28, is without merit, for Crowley and her co-workers repeatedly alerted team leaders and supervisors about Juhl's conduct. L.L. Bean representatives admitted that the proper procedure for an employee to report a claim of harassment was to notify his or her team leader. Once a team leader received a complaint from an employee, it was the team leader's duty to report the complaint up the chain of command to his or her supervisor. Therefore, by maintaining a policy that permitted workers to report sexual harassment claims to team leaders, L.L. Bean provided these team leaders with actual authority to receive notice of sexual harassment complaints on behalf of the company, and their knowledge was imputed to it. See, e.g., Sims, 196 F.3d at 920 (stating that "employer liability could attach if information of the harassment had come to the attention of someone who is reasonably believed to have a duty to pass on the information"). As such, Crowley provided sufficient evidence for

a reasonable jury to find that L.L. Bean knew or should have known about Juhl's harassment.

ii. Whether L.L. Bean Took Prompt and Appropriate Action

L.L. Bean contends that the evidence offered at trial did not support a jury finding that it failed to take prompt and appropriate remedial action after receiving Crowley's complaints. In fact, it asserts that "[w]hen Crowley conveyed her concerns previously to a supervisor or a human resources representative, L.L. Bean took immediate action." Br. of Appellant at 28. L.L. Bean argues:

> Ultimately, Crowley's argument boils down to a claim that L.L. Bean is strictly liable for any encounter between Crowley and Juhl because its prior warnings to Juhl to stay away from Crowley and not to bother her, and its prior actions in separating them, were not 100 percent effective in preventing Crowley and Juhl from ever crossing paths again. Suffice it to say, this is not the law.

Id. at 31.

To be sure, reasonable jurors might have agreed with L.L. Bean's argument that, although its remedial actions were not 100% effective, it did take prompt and appropriate action and therefore should not be liable for Juhl's unlawful conduct. There is some force to its argument that inasmuch as Crowley actually conceded in her testimony that she was pleased with L.L. Bean's responses to her complaints prior to June 23, 1998,[4] it should escape liability.

---

[4]At trial, the following exchange occurred:

Attorney.     And so until June 23, 1998, you

-28-

<u>See</u> Br. of Appellant at 28. Having said that, however, we do not review the jury's findings <u>de novo</u>, but instead must uphold the jury verdict unless no reasonable person could have reached its conclusion.

The jury obviously concluded that L.L. Bean did not take prompt and appropriate action to protect Crowley from Juhl, and this conclusion was not unreasonable. Aside from suspending and eventually terminating Juhl after Crowley obtained a permanent court protection order against him, the only significant remedial action L.L. Bean ever took to protect Crowley from Juhl was to schedule Crowley and Juhl in different buildings or on different shifts. For instance, after Juhl broke into Crowley's home in February 1997, Human Resources ordered that Juhl and Crowley be kept separated. Then, after disregarding numerous complaints by Crowley over the ensuing year and a half, L.L. Bean finally issued a written warning to Juhl in June 1998 for "creat[ing] a hostile

---

|  |  |
|--|--|
|  | thought the team leaders were doing enough to take care of the situation with Mr. Juhl; is that fair to say? |
| Crowley: | Yes. |
| Attorney: | And so you did not have complaints with what L.L. Bean was doing up until June 23, 1998? |
| Crowley: | Yes. |

Tr. 198.

work environment in which [Crowley] felt physically threatened" and ordered him to "take action to avoid further contact with Eileen Crowley."  In short, L.L. Bean adopted the same remedial action in June 1998 as it had in February 1997, even though (1) the earlier action had proven ineffective, (2) Crowley repeatedly had complained to her team leaders and supervisors that Juhl wantonly ignored the directive, (3) supervisors often failed to abide by the policy and permitted Juhl and Crowley to work together, and (4) the cumulative effect of Juhl's conduct over the year-and-a-half period only had exacerbated the hostile work environment in which Crowley was forced to work.

Consequently, although L.L. Bean may have made a good faith effort to implement an effective remedial measure in February 1997, it could not turn a blind eye towards the measure's ineffectiveness over the following 18 months, only to reinstitute the same inadequate remedial measure in response to its finding that Juhl had subjected Crowley to a hostile work environment. Thus, based on L.L. Bean's pattern of indifference towards Crowley's complaints about Juhl between February 1997 and June 1998, it cannot be said that a reasonable jury could not find that L.L. Bean failed to take prompt and appropriate action to protect Crowley from Juhl.

Furthermore, notwithstanding L.L. Bean's assertion that it "took immediate action" in response to each of Crowley's complaints, Crowley offered ample testimony supporting her position that L.L. Bean ignored many complaints she and her co-workers

-30-

submitted concerning Juhl's behavior. Rather than reiterate each instance in which L.L. Bean failed to respond to Crowley's complaints, we simply will direct the parties to our summary of the evidence above. See supra Part III.A.1.b. There, one will see that L.L. Bean did not respond to Crowley's complaints to Human Resources in May 1997, to Leo Davis in the summer of 1997, to Bob Anderson in January 1998, to David Baker and Steve McCourt in February 1998, to Peter Farley in April 1998, to Leo Davis again in June 1998, and to Peter Farley again in June 1998.

In the end, we believe that a determination of whether L.L. Bean should be liable for Juhl's conduct by reason of its failure to take prompt and appropriate action to protect Crowley from Juhl raised a question that the jury might have resolved either way. As already noted, however, our task is not to determine whether we agree with the jury's verdict, but to determine whether a reasonable person could have arrived at its conclusion. In light of the heavy burden placed on L.L. Bean to overturn the verdict based on sufficiency of the evidence grounds, we conclude that Crowley presented sufficient evidence for a reasonable person to conclude that L.L. Bean failed to take prompt and appropriate action to put an end to Juhl's stalking of Crowley. Therefore, we will not upset the verdict based on L.L. Bean's argument that the evidence was insufficient to support it, and thus, we will not reverse the order of the district court denying L.L. Bean judgment as a matter of law on this basis.

## 2. Systemic Violation Claim

L.L. Bean next challenges the jury's finding that it committed a systemic violation. It argues that Crowley failed to present evidence that it maintained a "discriminatory policy or practice." It also contends that its alleged failure to recognize that Juhl was stalking and sexually harassing Crowley is not sufficient to hold it liable for a systemic violation. See Br. of Appellant at 40.

As already explained, Title VII required Crowley to file her charge of employment discrimination with the EEOC within 300 days of the alleged sexual harassment. See 42 U.S.C. § 2000e-5(e)(1). The continuing violation doctrine, however, "creates an equitable exception to the 300-day limitation when the unlawful behavior is deemed ongoing." Provencher v. CVS Pharmacy, Div. of Melville Corp., 145 F.3d 5, 14 (1st Cir. 1998). Traditionally we have recognized that "[c]ontinuing violations may be serial or systemic" and have distinguished between such violations. Id. "Systemic violations occur where an employer maintains a discriminatory policy, responsible for multiple discriminatory acts that fall outside the limitations period." Rivera-Rodriguez v. Frito Lay Snacks Caribbean, 265 F.3d 15, 21 (1st Cir. 2001) (citing Pilgrim v. Trustees of Tufts College, 118 F.3d 864, 869 (1st Cir. 1997)). On the other hand, there is a serial violation "where the plaintiff experiences a number of discriminatory acts arising from the same discriminatory animus." Id. at 22. In this case, the district court in recognition of the case law at the time of the

trial instructed the jury on the distinction between continuing and systemic violations. The jury then found that L.L. Bean had committed a systemic violation, but not a serial violation.

Crowley submits that the jury's verdict is supporatable because L.L. Bean's sexual harassment policy is fundamentally flawed insofar as it prohibits only sexually offensive behavior, not nonsexual conduct motivated by gender bias. Crowley contends that L.L. Bean's sexual harassment policy "by definition fails to address a wide range of illegal harassment that is directed at a victim because of gender but that does not fall within the stereotypical scenario of pin-ups, breast-grabbing, and lewd comments." Br. of Appellee at 32. Consequently, according to Crowley's theory, L.L. Bean committed a systemic continuing violation by maintaining a sexual harassment policy that led its managers and supervisors to identify Juhl's stalking and harassment of Crowley as non-sexual conduct that did not warrant investigation or remediation.

Clearly there is factual support for Crowley's argument inasmuch as L.L. Bean's sexual harassment policy focuses primarily on sex-related conduct, rather than on nonsexual -- yet inappropriate -- behavior motivated by gender. Indeed, L.L. Bean's employee guide provides, in relevant part:

> Generally speaking, sexual harassment is defined as conduct or behavior that is intimidating, hostile, offensive and/or interferes with an employee's work performance. It includes conduct that creates a hostile work environment.

-33-

> Some examples of harassing behaviors include,
> but are not limited to:
>
> - Offensive sexual flirtations
> - Verbal or physical abuse of a sexual nature
> - Sexually suggestive gestures Advances or propositions
> - The display of sexually suggestive objects, pictures, or written materials
> - Lewd nicknames
> - Sexual practical jokes or horseplay

App. 111-12. Furthermore, a Human Resources manager testified that L.L. Bean's sexual harassment policy related to "sexual acts" rather than nonsexual conduct motivated by gender and that L.L. Bean's policy did not prohibit an employee from stalking a person because of his or her gender.

Nevertheless, it does not appear that L.L. Bean itself maintained a "discriminatory policy or practice," Megwinoff v. Banco Bilbao Vizcaya, 233 F.3d 73, 77 (1st Cir. 2000), but simply developed and implemented an anti-sexual harassment policy that does not adequately protect its employees from all forms of actionable sexual harassment. L.L. Bean's failure, therefore, is distinguishable from traditional discriminatory polices and practices such as refusing to hire women or paying women less than men. Moreover, L.L. Bean's ineffective sexual discrimination policy does not discriminate against a certain class of individuals, such as women or minorities, but rather treats all employees equally inasmuch as it provides every employee the same inadequate protection. Crowley has cited no case that supports her theory that maintaining a substandard sexual harassment policy

-34-

constitutes a "discriminatory policy or practice," and we were unable to find any caselaw supporting this novel theory. In the circumstances, we are satisfied that based on the evidence presented at trial, the jury's conclusion that L.L. Bean committed a systemic violation is problematic.

We need not resolve the point definitively, however, for we are satisfied that the jury's possible error in concluding that there was a systemic violation was harmless in the wake of the Supreme Court's decision in Morgan. Under the rule of that case it is no longer necessary for a jury to determine whether a violation is systemic or serial when considering the timeliness of a hostile work environment claim. The Court in Morgan explained that a "hostile work environment claim is comprised of a series of separate acts that collectively constitute one 'unlawful employment practice.'" Morgan, --- U.S. at ---, 122 S. Ct. at 2074. Based on that premise, the Court held that "consideration of the entire scope of a hostile work environment claim, including behavior alleged outside the statutory time period, is permissible for the purposes of assessing liability, so long as any act contributing to that hostile environment takes place within the statutory period." Id. at ---, 122 S. Ct. at 2068. See also id. at 2074 ("Provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by the court for the purposes of determining liability.").

Inasmuch as under <u>Morgan</u> the entire period during which a victim is subjected to a hostile work environment now constitutes one "unlawful employment practice," <u>Morgan</u> supplants our jurisprudence on the continuing violation doctrine in hostile work environment claims, making it no longer necessary to distinguish between systemic and serial violations. And because the hostile work environment created by Juhl extended into the statutory period -- <u>i.e.</u>, after February 24, 1998 -- Crowley satisfied the standard <u>Morgan</u> set forth and therefore was able to pursue her hostile work environment claim based partially on events that occurred outside the limitations period.[5]

B. <u>New Trial</u>

L.L. Bean argues that in the event we do not grant it judgment as a matter of law, in the alternative we should reverse the district court's order denying it a new trial. L.L. Bean's bases for a new trial include juror bias, erroneous evidentiary rulings, and improper jury instructions. We reject L.L. Bean's request for a new trial, as none of its arguments has merit.

---

[5]We note that the Supreme Court of New Jersey recently followed <u>Morgan</u> in construing the New Jersey Law Against Discrimination to resolve a statute of limitations question in a hostile environment continuing violation case without mentioning the distinction between systemic and serial violations, thus implicitly holding that the distinction does not matter when resolving the limitations question. <u>See</u> <u>Shepherd</u> v. <u>Hunterdon Developmental Ctr.</u>, 803 A.2d 611, 623 (N.J. 2002). We make explicit under Title VII what the New Jersey court held implicitly under the similar New Jersey law.

1. <u>Juror Bias</u>

L.L. Bean argues that it is entitled to a new trial because one of the jurors neglected to disclose her "possible bias" during <u>voir dire</u> by failing to reveal that she is a lawyer affiliated with the New England Research Institute who not only represented a female plaintiff in a sex discrimination suit in federal court, but also investigates and researches legal topics relating to women's health and quality of life issues. Crowley responds that L.L. Bean's charges of "possible bias" are purely speculative and that it has not even tried to demonstrate that the juror's background would have affected the outcome of the trial.

To secure a new trial based on a juror's inaccurate answers during <u>voir dire</u>, "a party must first demonstrate that a juror failed to answer honestly a material question on <u>voir dire</u>, and then further show that a correct response would have provided a valid basis for cause." <u>McDonough Power Equip.</u>, 464 U.S. at 556, 104 S. Ct. at 850. When seeking a new trial based on non-disclosure of information by a juror during <u>voir dire</u>, however, a party "must do more than raise a speculative allegation that the juror's possible bias may have influenced the outcome of the trial." <u>Dall</u>, 970 F.2d at 969.

L.L. Bean sets forth the following facts and assertions to support its argument that the juror failed to disclose her "possible bias." Following the trial, the juror wrote a letter to the trial judge asking permission to speak with Crowley's attorney, explaining that she "found the case to be most interesting, in

particular because of my training as a psychologist and my interest as a research scientist."  After the judge shared the letter with the parties, L.L. Bean discovered that the juror (1) worked for the New England Research Institute; (2) investigated and researched women's issues, including topics on women's health as well as child custody in battered-women cases; and (3) as a "family lawyer," represented a woman in a federal sexual discrimination case.[6]

On the basis of the foregoing information, L.L. Bean contends that the juror was dishonest when she failed to disclose her background after the judge asked the prospective jurors during voir dire whether they knew "of any reason whatever, whether I have asked you about it or not why you would have a concern about your ability to serve as a fair and impartial juror if you are selected in this case."  Br. of Appellant at 42 (quoting Tr. of Voir Dire at 24).   L.L. Bean insists that if the juror had disclosed her "research interest in this case" as well as her professional experience as an attorney in a sex discrimination case, it would have successfully challenged her for cause. Id. at 44.

We reject L.L. Bean's argument for several reasons. First, notwithstanding its assertions to the contrary, it has not

---

[6]We are surprised that L.L. Bean was in the dark about the juror's background until she wrote her letter.  In this regard, we point out that in its brief it cites three Maine Supreme Judicial Court cases in which it indicated that she "acted as a family lawyer [representing] women in contested family disputes." Br. of Appellant at 43.  All three cases resulted in published opinions in which her name appeared as an attorney.  Moreover, the federal sex discrimination case produced a Westlaw opinion in which her name appears as an attorney.

demonstrated that the juror was dishonest in response to the court's question. Although L.L. Bean may believe that the juror's background and experience would make her biased, it does not follow that she believed that she could not be a fair and impartial juror because of her experiences.

Second, L.L. Bean bases its charge of possible bias on its assumption that the juror is biased against all men and all employers because she researched women's issues and served as an attorney some years ago in a sexual discrimination suit. We agree with the district court in its assessment that "[t]he suggestion that an interest in women's issues naturally correlates to a dislike for men and employers is" unfounded.

Third, L.L. Bean only speculates as to whether the juror actually is biased, for it has not "demonstrate[d] actual prejudice or bias," Dall, 970 F.2d at 969, but only has alleged "possible bias." Br. of Appellant at 41. As we have stated previously, the "'burden of proof must be sustained not as a matter of speculation, but as a demonstrable reality.'" Dall, 970 F.2d at 969 (quoting United States v. Vargas, 606 F.2d 341, 344 (1st Cir. 1979)). Therefore, because L.L. Bean has not met the standard for obtaining a new trial based on actual juror bias, we will affirm the district court's dismissal of its motion for new trial based on this ground.

2. Evidentiary Rulings

L.L. Bean contends that the district court made several erroneous evidentiary rulings that entitle it to a new trial. The district court, however, did not make an error of law or abuse its

discretion in any of these rulings, and therefore, we reject L.L. Bean's request for new trial based on these grounds.

### a. <u>Team Leader Hearsay</u>

L.L. Bean asserts that the district court erred when it allowed Crowley to introduce hearsay testimony that her team leader, Peter Farley, jokingly referred to Juhl as Crowley's "little stalker" after she reported an incident of harassment by Juhl in April 1998. L.L. Bean contends that the court improperly allowed the statement as an admission by a party-opponent under Fed. R. Evid. 801(d)(2), arguing that team leaders are not authorized to speak on its behalf, and therefore, "their statements cannot be considered within the scope of their agency as an employee of L.L. Bean." Br. of Appellant at 46.

L.L. Bean's argument fails for two reasons. First, the court did not allow Crowley to introduce the statement as an admission by a party-opponent under Fed. R. Evid. 801(d)(2). Rather, the court concluded that the statement did not constitute hearsay under Fed. R. Evid. 801(c) because it was not offered to prove the truth of the matter asserted. In other words, Crowley did not offer Farley's comments that Juhl is her "little stalker" to prove that Juhl is actually a stalker; she offered the statement to show that L.L. Bean management was aware of Juhl's behavior.

Second, even if the district court had admitted the statement as an admission by a party-opponent under Fed. R. Evid. 801(d)(2), we doubt that the court would have erred. Although L.L. Bean now maintains that team leaders are not supervisors and are

-40-

not responsible for hiring, firing, or disciplining employees, L.L. Bean admitted at trial that team leaders are, in fact, supervisors. For instance, Human Resources manager Pat Bressette-Long testified that team leaders were part of L.L. Bean's "leadership." Moreover, L.L. Bean's job descriptions state that team leaders are responsible for communicating and enforcing company policies, maintaining employee records, making recommendations on hiring, delivering disciplinary actions to employees, and handling personnel issues.

### b. Inadmissible Lay Opinions

L.L. Bean next argues that the district court improperly allowed Crowley's witnesses to offer lay opinions by characterizing Juhl's conduct toward Crowley as "stalking." L.L. Bean describes these comments as a "drive-by character assassination." Br. of Appellant at 49.

But Crowley's witnesses were not the only ones to use the term "stalking." Human Resources manager Pat Bressette-Long and supervisor David Simmons used the term "stalked" in their notes from their meeting with Crowley after Juhl broke into her home. Moreover, even L.L. Bean's attorneys used the term "stalked" at trial, at one point asking Bressette-Long whether supervisor Tim Marong ever mentioned "whether or not it was his conclusion that Ms. Crowley was being stalked or that is what [Crowley] had said to him." And in response, Bressette-Long stated that Crowley had, in fact, told Marong that she was being stalked. In the circumstances, we reject L.L. Bean's argument on this point.

-41-

c. <u>Non-Workplace Conduct</u>

L.L. Bean argues that the district court abused its discretion in denying its motion <u>in</u> <u>limine</u> to exclude evidence of Juhl's non-workplace conduct, such as Crowley's encounters with him at a bar and at the L.L. Bean Christmas party in 1996, his following her home one night in 1996, and his breaking into her home in February 1997.[7]  <u>See</u> Br. of Appellant at 51.  L.L. Bean failed, however, to make a timely objection at trial to evidence relating to Juhl's non-workplace conduct.  L.L. Bean only objected to "time-barred" evidence and actually stated to the district court that the jury "may take into consideration conduct that occurred off premises in determining whether the conduct at work was hostile environment."  Thus, L.L. Bean invited the ruling of which it now complains.

Assuming arguendo that L.L. Bean had preserved its objection, the district court would not have erred in allowing evidence relating to non-workplace conduct.  L.L. Bean opines that it cannot prevent and therefore should not be liable for an employee's off-site behavior.  Consequently, L.L. Bean believes that any evidence of non-workplace conduct and interactions is irrelevant and should be precluded.  Courts, however, do permit

---

[7]L.L. Bean also submits that the district court erred when it denied its motion to exclude evidence relating to Juhl's conduct prior to February 24, 1998.  <u>See</u> Br. of Appellant at 51.  As discussed repeatedly throughout this opinion, however, the jury was permitted to consider this evidence and hold L.L. Bean liable for maintaining a hostile work environment prior to February 24, 1998, as long as the hostile work environment extended into the statutory period.

evidence of non-workplace conduct to help determine the severity and pervasiveness of the hostility in the workplace as well as to establish that the conduct was motivated by gender.  For example, in O'Rourke, we affirmed a verdict in favor of a sexual harassment victim who had offered evidence that she had received crank phone calls at home.  See O'Rourke, 235 F.3d at 724.  In this case, Juhl's intimidating behavior and hostile interactions with Crowley outside of work help explain why she was so frightened of Juhl and why his constant presence around her at work created a hostile work environment.

### d. L.L Bean's Investigation

L.L. Bean contends that the district court improperly excluded as hearsay certain documents relating to its investigation of a confrontation between Crowley and Juhl on June 23, 1998.  L.L. Bean asserts that a report prepared by team leader Leo Davis "paints a very different picture [of Juhl] than the caricature presented by Crowley," and the court's exclusion of the report of the investigation "significantly hamstrung [L.L. Bean] in presenting its defense."  Br. of Appellant at 53.

Aside from explaining how critical it believes that this report was to its defense, L.L. Bean does not indicate the reasons why the district court's exclusion of the documents was improper or the basis for admitting the documents.  L.L. Bean mentions in its brief that Davis interviewed witnesses to the confrontation as well as Juhl and Crowley.  If that is the case, L.L. Bean would have to overcome a double hearsay problem for the evidence to be

-43-

admissible. See United States v. Reilly, 33 F.3d 1396, 1410 (3d Cir. 1994). L.L. Bean does not, however, attempt to find exceptions to address the multiple layers of hearsay. Moreover, L.L. Bean does not explain why the information in the report could not have been elicited through direct testimony rather than through the hearsay document. Overall, we are satisfied that L.L. Bean has not demonstrated on appeal that the district court abused its discretion in disallowing the documents.

### 3. Jury Instructions

L.L. Bean's last rationale for requesting a new trial is to claim that the district court provided flawed jury instructions. See Br. of Appellant at 55-60. It argues that the court gave erroneous instructions on the elements of a systemic violation by failing to make clear that Crowley had to prove that it maintained a discriminatory policy or practice relating to hiring, training, promotions, firing, and compensation.

Even if these jury instructions were flawed legally as L.L. Bean contends, we conclude that the error was harmless in light of the Supreme Court's decision in Morgan. As we already explained above, Morgan eliminates the need for juries to determine whether there was a systemic or serial violation in order to invoke the continuing violations doctrine and thus to allow consideration of discriminatory acts that fell outside the limitations period. The Court explained in Morgan that "[p]rovided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by

-44-

the court for the purposes of determining liability." Morgan, ---
U.S. at ---, 122 S. Ct. at 2074.  Moreover, the asserted error
would not have contributed to the jury's finding that the violation
was ongoing.

Finally, L.L. Bean argues that the district court erred
by refusing to instruct the jury that it must determine whether a
hostile work environment existed based on Juhl's behavior at work,
not his non-workplace conduct.  See Br. of Appellant at 56.  As
with L.L. Bean's challenge to the court's evidentiary ruling
allowing evidence of Juhl's non-workplace conduct, Crowley
maintains that L.L. Bean actually waived its objection by telling
the district court that the jury could "take into consideration
conduct that occurred off premises in determining whether the
conduct at work was hostile environment."

Whether or not L.L. Bean waived its objection, it is
inconceivable to us that the jury could have found L.L. Bean liable
for maintaining a hostile work environment by disregarding the
overwhelming amount of evidence of Juhl's harassment on L.L. Bean's
premises and instead basing its verdict on the comparatively few
incidents involving Juhl's non-workplace conduct.  As such, we
conclude that even if it would have been advisable to charge the
jury as L.L. Bean had requested, the  district court's refusal to
do so did not affect L.L. Bean's "substantial rights" and therefore
amounts to nothing more than harmless error under Fed. R. Civ. P.
61.  Cigna Ins. Co. v. Oy Saunatec, Ltd., 241 F.3d 1, 8 (1st Cir.
2001).

## IV. CONCLUSION

For the foregoing reasons, we affirm the order of the district court denying L.L. Bean's motion for a judgment as a matter of law or, in the alternative, a new trial and uphold the jury verdict in favor of Eileen Crowley.

**<u>Affirmed</u>**.