# United States Court of Appeals
## For the First Circuit

No. 10-1387

ARTHUR RAY WILSON,

Plaintiff, Appellant,

v.

MOULISON NORTH CORPORATION,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MAINE

[Hon. George Z. Singal, U.S. District Judge]

Before

Boudin, Circuit Judge,
Souter,* Associate Justice,
and Selya, Circuit Judge.

Guy D. Loranger, with whom Nichols, Webb & Loranger, PA was on brief, for appellant.
Timothy J. O'Brien, with whom Gene R. Libby and Libby O'Brien Kingsley & Champion, LLC were on brief, for appellee.

March 21, 2011

---

*Hon. David H. Souter, Associate Justice (Ret.) of the Supreme Court of the United States, sitting by designation.

**SELYA**, **Circuit Judge**.  This appeal has its genesis in the plaintiff's complaint that coworkers created a workplace permeated by racially discriminatory taunts.  The pivotal issues implicate two important aspects of employer liability: the appropriateness of disciplinary action taken in response to an initial complaint of harassment and the reporting requirement that must be satisfied to trigger a duty to take remedial action for subsequent harassment.  The district court, in a thoughtful rescript, rejected the plaintiff's claims of employer liability and entered summary judgment accordingly.  Wilson v. Moulison N. Corp., 691 F. Supp. 2d 232, 239 (D. Me. 2010).  We affirm.

## I.  BACKGROUND

Because this appeal follows a grant of summary judgment, we rehearse the facts in the light most favorable to the nonmovant (here, the plaintiff), drawing all reasonable inferences in his favor.  Ahern v. Shinseki, 629 F.3d 49, 51 (1st Cir. 2010); Cox v. Hainey, 391 F.3d 25, 27 (1st Cir. 2004).

Defendant-appellee Moulison North Corporation is a Maine-based electrical utility contractor, specializing in the installation and repair of large lighting systems (e.g., airport runway illumination).  Ken Moulison is its owner and chief executive.

The events undergirding this appeal took place in 2006.  Plaintiff-appellant Arthur Ray Wilson, an African-American male,

started working for the company on May 22. He was assigned to a project at the Portland Jetport, where he labored alongside William Stineford, Dale Small, and Ryan Polley (all white males). Polley had the most seniority and functioned as the lead worker. As such, he allotted daily work assignments when the supervisor, Bill Rowe, was elsewhere.

Federal law encourages employers to establish antiharassment policies. Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 764 (1998). At all times relevant to this appeal, the company had such a policy in effect.[1] This policy directs employees to report harassment either to a "supervisor or to Ken Moulison." For ease in compliance, it lists Moulison's telephone number.

The plaintiff's woes began almost immediately after he joined the company. In late May, Stineford referred to him as "Aunt Jemima" (a reference that the plaintiff reasonably regarded as a racial slur). In response to this dysphemism, the plaintiff asked Stineford to refer to him by name. Stineford then used another racial epithet and stated that this was "how he talked to other niggers."

---

[1] To be precise, the company has an antiharassment policy contained in its employee manual, and supplements that description by disseminating an annual notification of its antiharassment policy. The two iterations of the policy appear to be designed to be read together.

At around the same time — the record is muddled and the parties disagree as to the exact chronology — Stineford, Small, and the plaintiff were digging in hard dirt. Stineford loudly described the task as "nigger work." Polley overheard this remark, told Stineford that it was inappropriate, and suggested that he "watch [his] mouth." When the plaintiff informed Polley about the "Aunt Jemima" comment, Polley asked both Stineford and Small to refrain from using such expressions. As a further precaution, Polley assigned Stineford and Small to tasks in a different area, thus temporarily separating them from the plaintiff.

Polley's well-meaning importunings fell on deaf ears: Stineford made continued use of the word "nigger" and an unidentified coworker referred to the plaintiff as "lips," which the plaintiff reasonably believed to be a racial slur. The plaintiff complained to Polley about these incidents, but Polley took no further action.

On June 5, the plaintiff called Ken Moulison. When Moulison returned the call the same day, the plaintiff described what had happened. Moulison then contacted Polley, who confirmed the plaintiff's account.

Moulison did not let the matter linger. On June 6, he visited the job site and confronted Stineford and Small. Neither of them denied the plaintiff's allegations. Moulison became irate and berated the men, making clear that such misconduct was

unacceptable.  He declared that each of them was working with "a foot out the door" and that any further incidents of harassment, no matter how minor, would result in immediate termination.

To give context to this warning, we note that the company's antiharassment policy states in pertinent part: "Disciplinary measures [for prohibited harassment] may include oral or written warnings, suspension, or termination depending upon the severity of the offense."

Before leaving the job site, Moulison spoke with the plaintiff.  He apologized for the offensive behavior of the plaintiff's coworkers and confirmed that any repetition of that behavior would result in their dismissal.  Moulison then told the plaintiff to report any further problems to him without delay.  The plaintiff assured Moulison that he would do so.[2]

Notwithstanding Moulison's warning, Stineford's use of racial epithets persisted.  In addition, the plaintiff's relationship with other coworkers began to deteriorate.  The plaintiff considers this deterioration to be part of the racial discrimination that he experienced and, for summary judgment purposes, we accept that allegation as true.

The plaintiff continued working at the Portland Jetport into August.  While there, several untoward incidents occurred.

---

[2] Although Moulison did not say so, the plaintiff understood that he also could report further acts of harassment to Polley.  We shall elaborate on this point in our discussion of the issues.

Once, a coworker slapped him on the hand with a live electrical wire. Another time, he was assigned to work with a live electrical wire (which he viewed as an attempt to place him in peril). On other occasions, he discovered that his water bottle had been contaminated with dirt, gas, or oil. Throughout, coworkers repeatedly yelled at him, swore at him, and refused to help him with his assigned tasks. Although he complained to Polley, Polley took no corrective action.

During this time frame, Moulison frequently visited the job site. The plaintiff had ready access to him but never apprised him of any of these developments.[3] Similarly, Moulison was readily available by telephone, but the plaintiff placed no call to him. By like token, the plaintiff never complained to Rowe (the supervisor). Finally, the summary judgment record contains no evidence that either Moulison or Rowe witnessed any of the incidents of racial discrimination or learned about them third-hand.

During August, the company reassigned the plaintiff to an airport project in Manchester, New Hampshire. While so engaged, he had numerous opportunities to speak to Moulison (for example, he

---

[3] On one such visit, the plaintiff did try to speak to Moulison, but ongoing work took precedence and Moulison left the site before the men could talk. The plaintiff made no effort to follow up.

unloaded his tools outside Moulison's office each day upon returning from Manchester) but did not lodge any complaint.

On September 28, the plaintiff injured his back while working and went out on disability. He never returned to work. Instead, he sued the company for discrimination in Maine's federal district court. His complaint asserted hostile work environment and retaliation claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e-2 and 2000e-3.

Following pretrial discovery, the company moved for summary judgment. See Fed. R. Civ. P. 56. The plaintiff opposed the motion. The district court concluded, inter alia, that the plaintiff had failed to make out a trialworthy issue as to employer liability and granted the motion. Wilson, 691 F. Supp. 2d at 239. This timely appeal ensued.

## II.  STANDARD OF REVIEW

We review a district court's grant of summary judgment de novo. Ahern, 629 F.3d at 53. We will affirm only if the record, viewed in the light most favorable to the summary judgment loser, discloses no genuine issue as to any material fact and confirms that the moving party is entitled to judgment as a matter of law. Vineberg v. Bissonnette, 548 F.3d 50, 55 (1st Cir. 2008). Although we draw all reasonable inferences in the nonmovant's favor, he nonetheless "must point to 'competent evidence' and 'specific facts' to stave off summary judgment." Tropigas de P.R., Inc. v.

-7-

Certain Underwriters at Lloyd's of London, ___ F.3d ___, ___ (1st Cir. 2011) [No. 10-1122, slip op. at 8] (quoting McCarthy v. Nw. Airlines, Inc., 56 F.3d 313, 315 (1st Cir. 1995)). A properly supported summary judgment motion cannot be defeated by conclusory allegations, improbable inferences, periphrastic circumlocutions, or rank speculation. Ahern, 629 F.3d at 54; Pagano v. Frank, 983 F.2d 343, 347 (1st Cir. 1993).

## III.  ANALYSIS

On appeal, the plaintiff pursues only his hostile work environment claim. Accordingly, we deem his earlier claim of retaliation abandoned. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990).

The plaintiff asserts that he was forced to toil in a racially hostile workplace, that the company unlawfully tolerated this discrimination, and that it did too little to deter the perpetrators. These circumstances, he says, render the company liable under Title VII. See 42 U.S.C. § 2000e-2. We examine this charge.

### A.  Legal Framework.

As a general proposition, a plaintiff may recover on a hostile work environment theory when "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."

Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993) (internal quotations omitted). The work environment "must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." Faragher v. City of Boca Raton, 524 U.S. 775, 787 (1998). In addition, the plaintiff must show that the employer is liable either for creating or for tolerating that atmosphere. See Noviello v. City of Boston, 398 F.3d 76, 84 (1st Cir. 2005); Crowley v. L.L. Bean, Inc., 303 F.3d 387, 401 (1st Cir. 2002).

The district court assumed that the plaintiff had been subjected to a racially hostile work environment. Wilson, 691 F. Supp. 2d at 236. We see no need to pussyfoot around this issue. Taking the plaintiff's evidence as true (as we must at the summary judgment stage), there is ample proof of racial slurs, epithets, and other objectively and subjectively offensive conduct. See Noviello, 398 F.3d at 94; O'Rourke v. City of Prov., 235 F.3d 713, 728-29 (1st Cir. 2001); see also Spriggs v. Diamond Auto Glass, 242 F.3d 179, 185 (4th Cir. 2001) (explaining that "the word 'nigger' is pure anathema to African-Americans"). On the record, whether the misconduct actually occurred and whether it created an actionably hostile work environment are questions for the trier of fact, not for the court.

This brings us to the nub of this appeal: the question of employer liability. "A plaintiff must satisfy different standards for establishing employer liability in a hostile work environment case depending on whether the harasser is a supervisor or co-employee." Crowley, 303 F.3d at 401. Because the plaintiff's harassers were coworkers, not supervisors, we cabin our inquiry accordingly.

"When coworkers, rather than supervisors, are responsible for the creation and perpetuation of a hostile work environment . . . an employer can only be liable if the harassment is causally connected to some negligence on the employer's part." Noviello, 398 F.3d at 95. In other words, the plaintiff must demonstrate that the employer knew or should have known about the harassment yet failed to take prompt and appropriate remedial action. Crowley, 303 F.3d at 401; White v. N.H. Dep't of Corr., 221 F.3d 254, 261 (1st Cir. 2000).

In the case at hand, the plaintiff seeks to impose employer liability for two distinct failings. First, he contends that the company is liable for the initial harassment (the incidents that he reported to Moulison on June 5) because Moulison imposed inadequate, slap-on-the-wrist discipline on Stineford and Small. Second, he contends that the company is liable for the subsequent acts of harassment (that is, the harassment that occurred after the June 6 reprimand) because his complaints to

Polley put the company on notice of that harassment, yet no remedial action ensued.  We address these plaints chronologically.

### B.  <u>Initial Harassment</u>.

It cannot be gainsaid that the company knew about the initial series of harassing incidents.  After all, the plaintiff complained directly to the owner, Moulison, about them.  This was in full compliance with the company's antiharassment policy.  No more was exigible to put the company on notice of the initial harassment.  See <u>Crowley</u>, 303 F.3d at 401; <u>Williamson</u> v. <u>City of Houston</u>, 148 F.3d 462, 466 (5th Cir. 1998).

But notice alone is not enough.  Liability only attaches if the employer, after receiving notice, fails to take prompt and appropriate ameliorative action.  <u>Forrest</u> v. <u>Brinker Int'l Payroll Co.</u>, 511 F.3d 225, 231 (1st Cir. 2007).  Although this inquiry calls for a case-by-case assessment, summary judgment will lie when the undisputed facts show that a reasonable jury could not help but conclude that the employer's response was both timely and appropriate.  See <u>id.</u> at 232.

In this instance, the company's response was both swift and appropriate.  After hearing the plaintiff's complaint, Moulison immediately looked into it, concluded that the misconduct had occurred, and reprimanded Stineford and Small in very strong terms. He made it abundantly clear that any repetition of the misconduct would result in their dismissal.

-11-

The plaintiff argues that a verbal reprimand and warning constituted too mild a sanction.  He emphasizes the hateful nature of the coworkers' speech and says that it should have resulted in their immediate discharge.  Cf. 29 C.F.R. § 1604.11(f) (stating that employers have a duty to "express[] strong disapproval" in response to harassment).  But there is no legal rule that requires treating hateful speech as the workplace equivalent of a capital offense.  Title VII operates less mechanically; it does not invariably require termination or suspension as a response to harassment (even serious harassment).  See Green v. Franklin Nat'l Bank of Minneapolis, 459 F.3d 903, 912 (8th Cir. 2006).

In most situations — and this case is no exception — the imposition of employee discipline is not a rote exercise, and an employer must be accorded some flexibility in selecting condign sanctions for particular instances of employee misconduct.  See Forrest, 511 F.3d at 232; see also Schaaf v. SmithKline Beecham Corp., 602 F.3d 1236, 1244 (11th Cir. 2010).  Even though the initial misconduct in this case was flagrant, the record contains no evidence that the perpetrators were repeat offenders.  For aught that appears, racial discrimination was not a long-standing problem for this employer.  Nor is there a history within the company of inconsistent discipline. In addition, the discipline that Moulison meted out conformed generally to the company's antiharassment policy, which provides that "[d]isciplinary measures [for

prohibited harassment] may include oral or written warnings, suspension, or termination depending upon the severity of the offense." Finally, the reprimand had teeth; Moulison did not mince words, demanded a halt to the misconduct, and threatened immediate dismissal in the event that the misconduct recurred.

To say more on this subject would be to paint the lily. The short of it is that, given the totality of the circumstances, the punishment seems to have fit the crime. See, e.g., Perry v. Ethan Allen, Inc., 115 F.3d 143, 154 (2d Cir. 1997); Intlekofer v. Turnage, 973 F.2d 773, 780 (9th Cir. 1992).

We appreciate the sincerity of the plaintiff's outrage, but the discipline imposed need not be such as will satisfy the complainant. See Lapka v. Chertoff, 517 F.3d 974, 985 (7th Cir. 2008). The plaintiff's argument that the sanction must have been inadequate because it was ineffective to stop the harassment is nothing more than a post hoc rationalization. See Porter v. Erie Foods Int'l, Inc., 576 F.3d 629, 637 (7th Cir. 2009). An employer's disciplinary decision must be evaluated in real time; it cannot be evaluated in hindsight. See Riggs v. AirTran Airways, Inc., 497 F.3d 1108, 1119 (10th Cir. 2007) (explaining that, in discrimination cases, courts should "consider the facts as they appeared to the [discriminator]" at the relevant time).

If more were needed — and we doubt that it is — there is an institutional value to progressive discipline. Such discipline,

-13-

beginning with a verbal warning, has regularly been recognized as an appropriate starting point in assessing this species of employer liability.[4]  See, e.g., Forrest, 511 F.3d at 231-32; Hirschfeld v. N.M. Corr. Dep't, 916 F.2d 572, 578 n.6 (10th Cir. 1990).  Barring exceptional circumstances (not present here), a reasoned application of progressive discipline will ordinarily constitute an appropriate response to most instances of employee misconduct.

For all of these reasons, we conclude that a reasonable jury could not find that the action Moulison took in response to the initial harassment was either untimely or inappropriate.

### C. Subsequent Harassment.

The second branch of the plaintiff's argument concerns the harassment that eventuated after Moulison chewed out Stineford and Small.  With respect to these incidents, the plaintiff complained only to Polley, who did nothing.  The question, then, reduces to whether those complaints sufficed to put the company on notice of the renewed harassment.  If not, there is no basis for employer liability.  See White, 221 F.3d at 261.

The plaintiff offers two reasons for imputing Polley's knowledge to the company.  We consider them separately.

_____

[4] To be sure, the plaintiff claims that Moulison's verbal warning was not the first step taken in the disciplinary process because Polley already had addressed the subject.  But Polley was a coworker, not a supervisor.  See infra Part III(C).  His comments, therefore, were not a factor in the company's disciplinary scheme.  See Noviello, 398 F.3d at 96.

-14-

**1. De Facto Supervisor**.  We begin with the plaintiff's first theory: that Polley, regardless of his title or lack of title, had supervisory responsibilities sufficient to make him a fitting recipient of a harassment complaint.  The company's antiharassment policy directs that notice be given either to a "supervisor or to Ken Moulison."  Under such language, employees can effectively lodge harassment complaints with one who, regardless of title, functions as a supervisor.  See Bombaci v. Journal Cmty. Publ'g Group, Inc., 482 F.3d 979, 984 (7th Cir. 2007); Williamson, 148 F.3d at 466.  Ordinarily, the determination of whether an employee is a de facto supervisor for Title VII purposes is factual in nature.  Noviello, 398 F.3d at 95.  Even so, a minimum factual predicate must be present to avoid summary judgment on such an issue.  Hrobowski v. Worthington Steel Co., 358 F.3d 473, 478 (7th Cir. 2004).

A supervisor is one who has "the authority to affect the terms and conditions of . . . employment."  Noviello, 398 F.3d at 96 (quotation omitted).  "This authority 'primarily consists of the power to hire, fire, demote, promote, transfer, or discipline an employee.'"  Id. (quoting Parkins v. Civil Constructors of Ill., Inc., 163 F.3d 1027, 1034 (7th Cir. 1998)).  In this context, a supervisor's responsibilities must include the duty to forward harassment complaints up the line (that is, to upper management).  See Bombaci, 482 F.3d at 984-85.

-15-

The plaintiff strives to brand Polley as a supervisor because Polley had been trained in the company's antiharassment policy, which assigns to supervisors the duty to respond to, and report, harassment complaints. But the company gave Polley this training after the events at issue here and only promoted him to supervisor in 2007. Consequently, his training as a supervisor is immaterial.

In an effort to blunt the force of these facts, the plaintiff points to a solitary reference to Polley as a "foreman," contained in a memorandum prepared by Moulison in July of 2006. But this nomenclature, even if accurate, does not affect the result. There is no mention of "foreman" in the company's antiharassment policy, and the dispositive inquiry remains whether, regardless of his title or lack of title, Polley possessed sufficient authority to rank him as a supervisor. See Chaloult v. Interstate Brands Corp., 540 F.3d 64, 75-76 (1st Cir. 2008); Noviello, 398 F.3d at 96. In the absence of the requisite authority, a title such as "foreman" does not transmogrify a line employee into a supervisor for Title VII purposes. See Cheshewalla v. Rand & Son Constr. Co., 415 F.3d 847, 850-51 (8th Cir. 2005). That he served as the lead worker at a particular job site — primus inter pares — does not alter this reality.

Given Polley's lack of actual authority, all that remains is the plaintiff's stated belief that Polley was his supervisor.

If Polley had apparent authority to accept notice for the company, this claim might have some bite.  See, e.g., Noviello, 398 F.3d at 96; Young v. Bayer Corp., 123 F.3d 672, 674 (7th Cir. 1997).  But the plaintiff identifies no significantly probative evidence of apparent authority and, standing alone, an employee's subjective belief is insufficient to create a triable issue of material fact about a coworker's status.  See Bombaci, 482 F.3d at 985; Cheshewalla, 415 F.3d at 851.

**2.  Delegated Authority**.  The plaintiff's second theory posits that, after dressing down Stineford and Small, Moulison expressly directed the plaintiff to report any further harassment to Polley.  In the plaintiff's view, this constituted a delegation of authority to Polley, whether or not Polley was a supervisor, to receive notice of future harassment.

The premise on which this argument rests is sound.  If an employer has designated a particular individual to accept notice of harassment, notice to that individual ordinarily will satisfy Title VII's knowledge requirement vis-à-vis employer liability.  See Williamson, 148 F.3d at 466; Young, 123 F.3d at 674.  Here, however, the claim that Moulison designated Polley as the point man for receiving future harassment complaints is not borne out by the record.

As framed, the plaintiff's "delegation" argument depends wholly on an exchange that took place during his deposition.  We

-17-

reproduce the critical question and the plaintiff's answer in their entirety:

> Q. All right. And Mr. Moulison told you at that point in time that if there were any other issues with them that you should contact him immediately, isn't that right?
>
> A. He said — I think he said to make sure Ryan [Polley] knows about it and then I am not sure exactly how it went, but I am quite sure that — I am almost — I know we talked and he said come to him but I understood that I would go to Ryan first still.

This testimony, when viewed in the light most favorable to the plaintiff, shows that Moulison told the plaintiff to report any future harassment to him. While it also shows that the plaintiff believed that he could effectively report such harassment to Polley, what the plaintiff understood and what Moulison said are two different things. To impute Polley's knowledge to the company on a delegation theory, the plaintiff would have to show, through competent evidence, that Moulison designated Polley to receive harassment complaints on the company's behalf. See Young, 123 F.3d at 674; see generally Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986) (holding that nonmovant must adduce "significantly probative" evidence in order to create a genuine issue of material fact). There is no evidence in this case either that Moulison told the plaintiff to report to Polley or that Moulison said something specific that reasonably could have been

-18-

understood in that way.  The evidence is that Moulison told the plaintiff to "come to him."[5]

That ends this aspect of the matter.  The company, in keeping with its obligations under Title VII, had in place a clearly stated antiharassment policy, which directed aggrieved employees to report harassment either to a supervisor or to the owner.  The plaintiff was aware of this policy (indeed, he used it successfully to report the initial harassment) yet failed to adhere to it with respect to the subsequent incidents of harassment.  This omission occurred despite the fact that Moulison reinforced the policy by explicitly instructing the plaintiff to speak directly to him.  Under these circumstances, the plaintiff's failure to put the defendant on notice of the renewed harassment is fatal to his claim of employer liability.  See Thompson v. Coca-Cola Co., 522 F.3d 168, 180-81 (1st Cir. 2008); Fontánez-Núñez v. Janssen Ortho LLC, 447 F.3d 50, 57 (1st Cir. 2006).

## IV.  CONCLUSION

We need go no further.  Racial taunts and slurs have no proper niche in the workplace, and no employee should have to

---

[5] Even if the plaintiff mistakenly believed that he could go to Polley in the first instance, he offers no explanation as to why he failed to follow Moulison's explicit instruction to contact him directly if other avenues proved to be dead ends.  An employee's claim that his employer failed to take remedial action is undercut where, as here, the employee inexcusably neglected to take advantage of a corrective measure offered by the employer.  See Faragher, 524 U.S. at 806-07; Chaloult, 540 F.3d at 74.

endure a racially hostile work environment comparable to that described by the plaintiff.  On the facts of this case, however, the blame lies squarely with the offending coworkers; the employer, when notified of what was happening, took prompt and appropriate corrective action.  The record reflects no principled basis for imposing employer liability.

**Affirmed**.