# United States Court of Appeals
## For the First Circuit

No. 11-1682

JUAN ESPINAL,

Plaintiff, Appellant,

v.

NATIONAL GRID NE HOLDINGS 2, LLC;
KEYSPAN NEW ENGLAND, LLC,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Richard G. Stearns, U.S. District Judge]

Before

Lynch, Chief Judge,
Lipez and Howard, Circuit Judges.

Alex G. Philipson for appellant.
David J. Kerman, with whom Sarah B. Herlihy and Jackson Lewis
LLP, were on brief for appellees.

August 23, 2012

**LYNCH**, **Chief Judge**.  Juan Espinal appeals from entry of summary judgment against his claims of race-based disparate treatment and of hostile work environment against National Grid NE Holdings 2, LLC, and Keyspan New England, LLC (collectively, "National").  Espinal v. Nat'l Grid NE Holdings 2, LLC, 794 F. Supp. 2d 285 (D. Mass. 2011).  His complaint alleges National punished him more harshly for a rules violation, on the basis of his Hispanic heritage, than it did a similarly situated white co-worker and permitted other National employees to harass him, in violation of Title VII, 42 U.S.C. § 2000e et seq.  We affirm.

I.

A.       Factual Background

We review the facts in the light most agreeable to plaintiff, drawing all reasonable inferences in his favor, Mulero-Rodríguez v. Ponte, Inc., 98 F.3d 670, 672 (1st Cir. 1996), and limit our discussion to those facts relevant on appeal.

National is a public utility company that sells and distributes natural gas to residential, commercial, and industrial customers.  As part of its business, National maintains a large underground gas distribution system, which from time to time leaks.  These leaks pose a significant public safety hazard, and the Massachusetts Department of Public Utilities requires National to dispatch a trained employee to any reported leak within sixty minutes.

Since December 2001, Espinal has worked as a Customer Meter Service Technician ("CMST") at National. He is currently a senior technician at the company's Beverly, Massachusetts location ("Beverly yard"). As a CMST, Espinal is responsible for investigating reported gas leaks while "on-duty" (i.e., during his regularly scheduled hours).[1] Additionally, one out of every four weeks, Espinal is "on-call." While on-call, Espinal must respond to gas leak pages from midnight to 8:00 a.m. and is the only Beverly yard employee scheduled to do so during these hours.

In 2004, Espinal was twice disciplined for failing to respond to pages while on-call. On March 17, 2004, Espinal did not respond to a page at 6:25 a.m. and National was unable to dispatch an employee within the sixty-minute time frame. Espinal received a verbal warning from his supervisors on the same day. Again, on September 1, 2004, Espinal did not respond to a page at 5:28 a.m. The dispatcher paged Espinal a second time, contacted him via his Nextel phone, and called his home phone number, all to no avail. After a disciplinary meeting on September 3, 2004, Espinal received a five-day suspension.[2]

---

[1] Espinal's regular shift was Tuesday through Saturday, from 4:00 p.m. to midnight.

[2] Espinal has been the subject of two subsequent disciplinary actions, occurring on February 15, 2007, and April 15, 2009, which do not bear on our resolution of his appeal.

The events giving rise to Espinal's discrimination claims began on July 10, 2005, when a dispatcher mistakenly paged Espinal while he was not on-call. Espinal suspected that another CMST had gone unpunished for failing to answer a gas leak page, and asked his union to obtain the "Order Details" (i.e., dispatch records) for that night.

The union requested the Order Details from National on July 19, 2005, to investigate "the potential subject of a grievance," and received them on August 25, 2005. On December 22, 2005, after reviewing the records, the union informed National that a missed page had gone unpunished, and National initiated a full investigation.[3]

National did not complete its investigation until October 2006, approximately ten months after receiving the email from the union. Espinal alleges that this delay was caused by National's discriminatory purposes, while the company submits it was attributable to scheduling conflicts, illnesses, and other exigencies, including a union rule requiring a showing of "good cause" for any disciplinary action. On the basis of the records and information collected, National determined that Daniel Racki --

---

[3] There is some dispute as to when National was first informed that the missed page had gone unpunished. Plaintiff submits it was in July or August of 2005, but the only clear indication of notice is an email from a union official to National, dated December 22, 2005. The dispute is not material to the outcome of this case.

a white CMST -- had missed the July 10 page.  On November 6, 2006, Racki received a five-day suspension.

On September 27, 2006, Espinal filed a Charge of Discrimination alleging disparate treatment with the Massachusetts Commission Against Discrimination ("MCAD").  At a subsequent union meeting in November 2006, held off National's premises and after company hours, Espinal's co-workers learned of his MCAD filing and of Racki's suspension, and they gave plaintiff a "rough night." Espinal alleges that his co-workers, most of whom are white, called him a "rat" and a "spic" and accused him of "outing" Racki. Following the meeting, National supervisors met with Espinal to discuss these events.  Espinal refused to disclose the names of his harassers and, upon further questioning, walked out of the meeting entirely.

On December 25, 2006, Espinal found the words "the rat" scrawled on his company vehicle.  Espinal reported the vandalism but again refused to disclose the names of any co-workers who had harassed him.  A manager of industrial relations at National gave Espinal his personal cell phone number and instructed plaintiff to call directly if another incident occurred.  National also held a meeting with union members and officials on January 5, 2007, to reiterate the company's zero tolerance policy for workplace harassment and to make clear that anyone who engaged in such behavior would be terminated.

-5-

On January 23, 2008, Espinal filed a second charge with the MCAD, alleging retaliation and harassment, in response to disparaging comments made by his co-workers. Acting through counsel, plaintiff refused to meet with a National representative to discuss the charge. To date, although Espinal submits that the harassment continues, he has not reported any additional incidents to National or disclosed the names of any perpetrators.

B.        Procedural History

On April 14, 2009, Espinal filed suit in the District of Massachusetts. As amended, his complaint advanced claims for racially motivated disparate treatment, hostile work environment, and retaliation, in violation of Massachusetts state and federal law. 42 U.S.C. §§ 2000e-2, -3; Mass. Gen. Laws ch. 151B, § 4(1), (4). On January 7, 2011, National filed a motion for summary judgment, which was argued at a hearing on March 17, 2011.

On May 13, 2011, the district court granted National's motion for summary judgment on all claims. As to plaintiff's disparate treatment claim, the trial court concluded that Espinal could not establish a prima facie case of discrimination or show that National's justification for disciplining him -- his inadequate job performance -- was pretextual. Espinal, 794 F. Supp. 2d at 292-94, 294 n.14. Espinal's hostile work environment claim was also deficient. The trial court found that National's efforts to combat any alleged harassment were adequate under the

standard for liability in co-worker harassment suits, and made in spite of Espinal's non-cooperation.  Id. at 294-95.

Espinal filed his timely notice of appeal on June 13, 2011.

II.

Espinal challenges the order of summary judgment on his claims of disparate treatment and hostile work environment.  We review a "grant of summary judgment de novo," Roman v. Potter, 604 F.3d 34, 38 (1st Cir. 2010), and will uphold it where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," Fed. R. Civ. P. 56(a).  We may affirm summary judgment "on any basis apparent in the record."  Chiang v. Verizon New Eng., Inc., 595 F.3d 26, 34 (1st Cir. 2010).

A.	Disparate Treatment

"In disparate-treatment cases, plaintiffs bear the ultimate burden of proving that they were the victims of intentional discrimination." Udo v. Tomes, 54 F.3d 9, 12 (1st Cir. 1995) (citing St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 507 (1993)).  Where, as here, a plaintiff is "unable to offer direct proof of their employers' discriminatory animus . . . we allocate the burden of producing evidence according to the now-familiar three-step framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-05 (1973)."  Id.

-7-

We recently set out the three-step McDonnell Douglas framework at length in Cham v. Station Operators, Inc., 685 F.3d 87, 93-94 (1st Cir. 2012), and need not do so again here. We bypass whether Espinal established a prima facie case of discrimination. Additionally, the parties do not dispute that National furnished a facially legitimate, non-discriminatory justification for disciplining Espinal -- namely, his failure to respond to the September 2004 on-call page. Accordingly, we proceed directly to Espinal's burden at the third stage of McDonnell Douglas.

To avoid summary judgment at the third stage in the McDonnell Douglas framework, "the plaintiff must introduce sufficient evidence to support two findings: (1) that the employer's articulated reason [for the disciplinary action] . . . is a pretext, and (2) that the true reason is discriminatory." Udo, 54 F.3d at 13 (citing Smith v. Stratus Computer, Inc., 40 F.3d 11, 16 (1st Cir. 1994)); see also Straughn v. Delta Air Lines, Inc., 250 F.3d 23, 34 (1st Cir. 2001). While these findings are distinct, the same evidence may be used to demonstrate both. However, taken together, this evidence must be sufficient to overcome "the ultimate burden of persuading the court that [plaintiff] has been the victim of intentional discrimination." Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 256 (1981);

see also Kosereis v. Rhode Island, 331 F.3d 207, 213-14 (1st Cir. 2003).

Plaintiff argues that his September 2004 suspension was improper and that National treated Daniel Racki more favorably than plaintiff following Racki's failure to respond to a gas leak page. From these premises, plaintiff argues that a reasonable jury could find National's explanation for each to be a pretext and that the real reason was discrimination against Hispanic employees.

Plaintiff's disagreement with National's reasons for disciplining him, on this record, does not allow inferences of pretext or discrimination. Plaintiff argues that his suspension was improper, as he denied receiving any of National's communications that night. In assessing whether an adverse employment decision is pretextual, we do "'not sit as a super-personnel department that reexamines an entity's business decisions.'" Gonzalez v. El Dia, Inc., 304 F.3d 63, 69 (1st Cir. 2002) (quoting Mechnig v. Sears, Roebuck & Co., 864 F.2d 1359, 1365 (7th Cir. 1998)). Our task is limited to determining whether the employer "believe[d] in the accuracy of the reason given for the adverse employment action." Kouvchinov v. Parametric Tech. Corp., 537 F.3d 62, 67 (1st Cir. 2008); see also Feliciano de la Cruz v. El Conquistador Resort & Country Club, 218 F.3d 1, 7 (1st Cir. 2000) ("[T]he question is not whether [plaintiff] was actually

performing below expectations, but whether [her employer] believed that she was.")

It is beyond dispute that responding to on-call pages was part of Espinal's duties as a CMST, and that he failed to respond to two pages, a Nextel page, and a home phone call on September 1, 2004. There is no indication that National believed plaintiff's excuses for missing these communications yet nonetheless suspended him. See Kouvchinov, 537 F.3d at 67 ("[I]t is not enough for a plaintiff to show that the decisionmaker acted on an incorrect perception."). Rather, National rejected his excuses. Further, National had previously let Espinal off with a verbal warning following a missed on-call page in March 2004, which Espinal also denies receiving. Failure to respond to reported gas leaks, as his job required, is a serious matter, with considerable public safety ramifications. There was no pretext.

Secondly, there was no differential treatment; Daniel Racki received an identical five-day suspension for failing to respond to a gas leak page. It is true that there were procedural differences. To employ these procedural differences "in his quest to raise an inference of racial discrimination," Espinal needed to show that Racki was (1) similarly situated to him in all relevant respects and (2) treated differently by National. See Conward v. Cambridge Sch. Comm., 171 F.3d 12, 20 (1st Cir. 1999).

-10-

Espinal and Racki were not similarly situated in several important respects, which led directly to these procedural differences. Unlike on the night on which Espinal missed a page, there was no "dispatch supervisor" present when Racki missed a page. Because dispatch supervisors are tasked with establishing the employee responsible for a missed page and preserving any relevant documentation, National had to begin its investigation into past events from scratch, collecting the night's phone, pager, and dispatch records, and interviewing all involved employees, in order to establish good cause for any resulting suspension. Espinal does not argue that these procedures were also appropriate when, as in his case, a dispatch supervisor was present. Because these "'differentiating or mitigating circumstances . . . distinguish . . . the employer's treatment'" of its employees, Perkins v. Brigham & Women's Hosp., 78 F.3d 747, 751 (1st Cir. 1996) (quoting Mitchell v. Toledo Hosp., 964 F.2d 577, 582 (6th Cir. 1992)), plaintiff's evidence is insufficient to overcome summary judgment.

For these reasons, plaintiff's disparate treatment claim founders at the third stage of McDonnell Douglas, and summary judgment was appropriate.

B.        Hostile Work Environment

Espinal alleges that National is liable for the harassment he endured at the hands of his co-workers. The standard

for imposing liability on an employer for workplace harassment is heightened where the perpetrators of that harassment were a plaintiff's co-workers, not his supervisors. Wilson v. Moulison N. Corp., 639 F.3d 1, 7 (1st Cir. 2011); see also Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 761 (1998); Faragher v. City of Boca Raton, 524 U.S. 775, 802 (1998). A plaintiff "must demonstrate that the employer knew or should have known about the harassment yet failed to take prompt and appropriate remedial action." Wilson, 639 F.3d at 7; see also Crowley v. L.L. Bean, Inc., 303 F.3d 387, 401 (1st Cir. 2002).

Accordingly, to overcome summary judgment on this claim, plaintiff needed to proffer sufficient evidence to show: first, that his co-workers' harassment was sufficiently "severe or pervasive" to engender a hostile work environment, Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993); and second, that despite having adequate notice of this harassment, National failed to take "prompt and appropriate" remedial action, Wilson, 639 F.3d at 7-8. Again, we bypass whether plaintiff's treatment by his co-workers, after his actions brought about the discipline of one of his fellow employees, was severe or pervasive, and turn to the second required showing.

It is clear that National took reasonable steps to address the alleged co-worker harassment based on the limited information Espinal was willing to provide. National received

-12-

notice of two incidents of harassment involving Espinal, in November and December of 2006, and met with Espinal promptly after each.

The November 2006 incident occurred off-site and after company hours, and there were no National managers in attendance. Espinal's direct supervisor only learned of the "rough night" through plaintiff's co-workers, and he met with plaintiff immediately after he learned of it. Plaintiff refused to disclose any details of the incident. Espinal's direct supervisor then contacted his superiors, who scheduled and held a meeting at which two National managers, two union officials, and plaintiff were in attendance. This meeting ended when plaintiff walked out, after refusing to disclose the names of his harassers. At the meeting following the December 2006 vandalism, a National manager of industrial relations provided Espinal with his personal cell phone number in case any other incidents occurred. Espinal never called, reported any additional incidents, or disclosed the names of any responsible parties. He also declined to meet with National following the filing of his harassment charge in January 2008.

Nonetheless, National managers did respond to plaintiff's allegations. They met with union members and officials to discuss these incidents and reiterate National's zero tolerance policy. National warned that any employee caught engaging in harassment would be terminated. The meeting was a prompt and appropriate

-13-

response.  In <u>Wilson</u> v. <u>Moulison North Corp.</u>, we affirmed summary judgment on a co-worker harassment hostile work environment claim where, upon plaintiff reporting clearer instances of race-based harassment than are alleged here, the employer warned the guilty employees that they would be terminated for any further harassment. 639 F.3d at 9.  The plaintiff in that case alleged that the harassment continued despite this warning, but he never reported any additional incidents to his supervisor, who had explicitly instructed plaintiff to do so.  <u>Id.</u> at 10.  We concluded that the employer's initial verbal warning "fit the crime" and that "plaintiff's failure to put [his employer] on notice of the renewed harassment [was] fatal to his claim of employer liability."  <u>Id.</u> at 8, 11.  So too, here.

Summary judgment was appropriate as to this claim.

### III.

The order of summary judgment is affirmed.