The **GOVERNOR AND COMPANY, OF the BANK OF SCOTLAND,**
Plaintiff,

v.

Bernard **WASSERMAN,** David **Wasserman,** and Richard **Wasserman, Defendants.**

**C.A. No. 10–328–M.**

United States District Court,
D. Rhode Island.

March 5, 2013.

---

Gayle P. Ehrlich, Jeffrey E. Francis, Pierce Atwood LLP, Boston, MA, Michael J. Daly, Pierce Atwood LLP, Peter J. Furness, Boyajian, Harrington, Richardson & Furness, Providence, RI, for Plaintiff.

Anthony M. Traini, Adam M. Ramos, Hinckley, Allen & Snyder LLP, Providence, RI, for Defendants.

## MEMORANDUM AND ORDER

JOHN J. McCONNELL, JR., District Judge.

This case involves a contract, personally guaranteed by the three businessmen, for a bank loan to allow for the purchase of a former St. Andrews University dormitory in Scotland to be developed into fractional ownership units. It is undisputed that the Defendants, Bernard Wasserman, Richard Wasserman, and David Wasserman, breached the contract and that the personal guarantees are valid.

The Governor and Company of the Bank of Scotland ("the Bank") filed suit against the Wassermans for breach of contract and breach of guaranty. (ECF No. 1.) Before the Court is the Bank's Motion for Summary Judgment on its two claims and on the Wassermans' counterclaims. (ECF No. 35.) The Wassermans opposed this motion. (ECF No. 39.) Despite the Wassermans' gallant attempts to throw many and varied curves at this extremely straightforward breach of contract case, the Court is unmoved and GRANTS the Bank's summary judgment motion.

## I. FACTS AND BACKGROUND

The Wassermans, through three newly created business entities, Hamilton Hall Venture LLC ("Hamilton Hall"), WREC Hamilton Hall, LLC, and St. Andrews Ventures, LLC, set out to purchase land and a former dormitory ("the Property") in St. Andrews, Scotland to create twenty-six fractional ownership units located behind the eighteenth green of the world-famous golf course in St. Andrews. (ECF No. 36 at ¶¶ 9–11; ECF No. 40 at ¶ 84.)

The Wassermans were, by their own admission, experienced businessmen and real estate developers. (ECF No. 45 at ¶¶ 76–78.) The Bank and Hamilton Hall financed the purchase through a Facility Agreement ("the Agreement") dated August 11, 2006. (*Id.* at ¶ 83.) The total potential loan was for £84,335,000 and was to be released in four tranches. The first tranche was for £27,500,000 to purchase the dormitory from St. Andrews University and for initial plans, permitting, and demolition. (ECF No. 36 at ¶ 25.)

After the Property was appraised, the Bank identified a loan to collateral deficiency of £9,500,000. (*Id.* at ¶ 17.) In August 2006, the Wassermans signed a personal guaranty ("the Guarantee") for up to £9,500,000 [1] as a condition to the Bank providing a loan to Hamilton Hall to fund the purchase of the dormitory. (ECF No. 45 at ¶ 88.) The Wassermans did not personally review the terms or sign the guaranty, but Alison Newton, their attorney in Scotland, signed on their behalf. (*Id.* at ¶ 91.)

The Wassermans experienced early success in garnering interest and prospective buyers for the fractional ownership units.[2] (*Id.* at ¶ 86.) However, because Hamilton Hall failed to meet the term of the Agreement that required it to have a minimum of £10,000,000 in deposits on fractionalized ownership interests by October 31, 2006 and £14,000,000 by December 31, 2006, the Bank refused to release more than the first payment of £27,500,000. (ECF No. 45 at ¶¶ 100, 102; ECF No. 36 at ¶¶ 24–27.) Hamilton Hall did not satisfy the deposit requirement, constituting a default

---

1. £9,500,000 equals approximately $14,717,452 in U.S. Dollars today.

2. Phil Mickelson, a very popular and well-known golfer signed onto the project almost immediately, purchased a unit, and entered into an agreement to help market the property. (ECF No. 45 at ¶ 85.)

under Sections 20.1.1, 20.1.2, and 20.2.2 of the Agreement. (ECF No. 36 at ¶ 27.)

On March 23, 2007, the Bank notified Hamilton Hall that it reserved its rights due to Hamilton Hall's failure to meet the agreed-to deposit requirements. (*Id.* at ¶ 28.) David Wasserman testified that he understood this notice to mean that the Bank could foreclose at any time. (*Id.* at ¶ 29.) Hamilton Hall approached the Bank with three strategies in order to salvage the project and/or limit their personal liability for the debt. (ECF No. 45 at ¶ 107–109.) It approached the Bank about refinancing, finding a new partner to bring more cash to complete the project, or finding a new buyer. (*Id.*) Although the Bank refused to refinance, the record suggests that it agreed to give Hamilton Hall additional time, until April 2008,[3] to work on the other potential deals. (*Id.*) Section § 31 of the Agreement provided that the documents involved in the deal, including the Guarantee, could only be amended or waived by a writing signed by the Wassermans and the Bank. (ECF No. 36 at ¶ 34.)

Hamilton Hall attempted to salvage the deal by bringing in three potential buyer groups for the Property to satisfy the loan—Donald Trump, Dermot Desmond, and Steven Carmichael and Neal McAllister. (*Id.* at ¶ 51.) To the extent that any of these three potential buyers had a serious interest in the project and negotiations developed with the Bank, the negotiations never resulted in a binding term sheet. (*Id.* at ¶ 53.) David Wasserman requested on December 15, 2008 that the Bank agree to forbear from exercising its rights and the Bank declined to do so. (*Id.* at ¶ 35.) On February 2, 2009, the Bank notified Hamilton Hall that it intended to foreclose, giving it two months to either cure its

default or seek judicial intervention before the Bank listed the Property for sale. (*Id.* at ¶ 63.) By April 2009, two years after the default, Hamilton Hall had failed to present an alternative acceptable to the Bank to pay off the loan. (*Id.* at ¶ 54.)

Faced with the information from the Bank that it intended to foreclose and sell the Property, the Wassermans allege that they were surprised to learn of these intentions because they assert that the Bank's agent Angela Smillie assured them that the Bank would not sell the Property, but by listing it for sale, were merely testing its pricing on the market. (ECF No. 45 at ¶ 136.) The Wassermans further assert that Ms. Smillie agreed that the Bank would not pursue the Guarantee against them in exchange for David Wasserman's agreement that he would not go public with the Bank's alleged unreasonable prevention of the three potential substitute transactions. (*Id.* at ¶¶ 137–138.) On June 8, 2009, however, the Bank told Hamilton Hall that it would sell the Property. (ECF No. 36 at ¶ 64.) Hamilton Hall participated in the open auction held on August 13, 2009, submitting an unsuccessful £6,000,000 bid. (*Id.* at ¶ 67.) The winning bid went to Kohler Co., the Old Course Limited, for £11,000,000, leaving £15,658,772.19 remaining due on the loan, plus default interest, fees and charges, including costs of collection. (ECF No. 36 at ¶¶ 71–72; ECF No. 45 at ¶¶ 139–140.)

The Bank then filed this suit against the three guarantors in order to recover this arrearage and costs. The Bank makes very straightforward claims in Counts I and II of its complaint. (ECF No. 1.) It alleges that the Wassermans breached the contract and the Guarantee

---

**3.** On April 8, 2008, the Bank terminated its obligation to pay the final three tranches. (ECF No. 36 at ¶ 33; ECF No. 45 at ¶ 102.) Over the next two years, Hamilton Hall paid no interest or fees on the loan, abandoned the Property, and did not pay property insurance. (ECF No. 36 at ¶ 32.)

because the contract and Guarantee were valid, the Wassermans failed to perform, the Bank did perform, and the Wassermans' breach damaged the Bank. The Bank also argues that it is entitled to summary judgment on the Wassermans' counterclaims for breach of the implied covenant of good faith and fair dealing, tortious interference with advantageous business relations, and misrepresentation. It argues that the Wassermans lack standing to assert these counterclaims and substantively, that these claims lack any merit.

## II. STANDARD OF REVIEW

Generally, a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56. The Court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in his [or her] favor. *Wilson v. Moulison N. Corp.*, 639 F.3d 1, 6 (1st Cir.2011). However, the non-moving party "must point to 'competent evidence' and 'specific facts' to stave off summary judgment." *Tropigas de P.R., Inc. v. Certain Underwriters at Lloyd's of London*, 637 F.3d 53, 56 (1st Cir.2011) (quoting *McCarthy v. Nw. Airlines, Inc.*, 56 F.3d 313, 315 (1st Cir.1995)).

In order to defeat a properly supported motion for summary judgment, therefore, the nonmoving party must establish a trial-worthy issue by presenting "enough competent evidence to enable a finding favorable to the nonmoving party." *Goldman v. First Nat'l Bank of Boston*, 985 F.2d 1113, 1116 (1st Cir.1993) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). A summary judgment motion cannot be defeated by "conclusory allega-tions, improbable inferences, acrimonious invective, or rank speculation." *Ahern v. Shinseki*, 629 F.3d 49, 54 (1st Cir.2010). When reviewing the evidence in the record in the light most favorable to the nonmovant, the Court must "safely ignor[e] 'conclusory allegations, improbable inferences, and unsupported speculation.'" *Colon–Fontanez v. San Juan*, 660 F.3d 17, 27 (1st Cir.2011) (quoting *Carroll v. Xerox Corp.*, 294 F.3d 231, 237 (1st Cir.2002)). The Court must constrain itself to determining matters of law. *See* Fed.R.Civ.P. 56.

## III. ANALYSIS

Before tackling the parties' legal arguments, the Court must first determine whether to apply Scottish law or Rhode Island law to the claims and counterclaims in this case.

### A. Choice of Law

■ The Bank argues that Scottish law applies because the Agreement contains a choice of law provision specifying Scottish law and because the entirety of the transaction involved in this suit occurred in Scotland. Moreover, the alternative application of Rhode Island law, for which the Wassermans advocate, is essentially the same as Scottish law so the Bank asserts that the Court should favor the law specified by the parties to the contract.[4] The Wassermans argue, relying on *Northeast Data Sys., Inc. v. McDonnell Douglas Computer Sys.*, 986 F.2d 607 (1st Cir. 1993), that the choice of law provision does not apply to their counterclaims and/or affirmative defenses because those claims or defenses challenge the validity of the contract so the choice of law provision is inoperative. They further assert that the Court should disregard the choice of law provision in the contract because it would

---

4. The Wassermans agree that Scottish and Rhode Island law are similar, but they argue that it makes the most sense for the Court to apply Rhode Island law. (ECF No. 39 at 13.)

impose a rule of law that would undermine Rhode Island public policy. (ECF No. 39 at 11.) Generally, " 'parties are permitted to agree that the law of a particular jurisdiction will govern their transaction.' " *Terrace Grp. v. Vermont Castings, Inc.*, 753 A.2d 350, 353 (R.I.2000) (quoting *Sheer Asset Mgmt. Partners v. Lauro Thin Films, Inc.*, 731 A.2d 708, 710 (R.I.1999)). "Moreover, the Restatement (Second) *Conflict of Laws* § 187(2)(a) (1971) states that '[t]he law of the state chosen by the parties to govern their contractual rights and duties will be applied * * * unless * * * the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice.' " *Sheer Asset Mgmt. Partners,* 731 A.2d at 710.

■ Because section 17.1 of the Guarantee provides that the contract "shall be governed by and construed according to Scots law[,]" this Court holds that Scottish law applies. This section is clear, unambiguous, and undisputed. *In Re: Newport Plaza Assocs.*, 985 F.2d 640, 645 (1st Cir. 1993). And while a court does not have to honor a choice of law clause if it finds a compelling reason not to do so, *Steinke v. Sungard Fin. Sys.*, 121 F.3d 763, 769 (1st Cir.1997), no such reason presents itself in this case. Scotland bears a substantial relation to the case because the transaction at the center of this dispute occurred in Scotland, the Bank is in Scotland, and the project was situated in Scotland. *Sheer Asset Mgmt. Partners,* 731 A.2d at 710. Moreover, the Court does not find that applying Scottish law to the claims in this case would undermine Rhode Island public policy because the parties negotiat-

ed for and agreed to the choice of law provision and all other provisions of that contract.

■ Moreover, the Court finds that Scottish law also applies to the Wassermans' counterclaims and affirmative defenses. The Wassermans' reliance on the *Northeast Data* case is misplaced. In that case, the court found that the fraud claim was not covered by the California choice of law provision in the contract because the fraud alleged occurred *during the formation of the contact,* presumptively invalidating the entire contract, including the choice of law provision. *Id.*, 986 F.2d at 611. That is different from the case at bar where the Wassermans' claims and defenses do not challenge the validity of the contract, but instead challenge its enforcement against the Wassermans in light of alleged oral agreements made *after* the contract ,was signed and after their default.[5] The choice of law provision in the contract therefore should apply to the entirety of the transaction. Therefore, the Court will apply Scots law to all of the substantive issues in the case.

## B. The Breach of Contract and Guarantee Claims

■ The first step in the Court's analysis of the Bank's motion is to examine the operative contract terms in the light of the principals of basic contract interpretation. "Contract interpretation is a question of law; it is only when contract terms are ambiguous that construction of terms becomes a question of fact." *Clark–Fitzpatrick, Inc./Franki Found. v. Gill,* 652 A.2d 440, 443 (R.I.1994). Contract lan-

---

5. The Court is aware, however, that the Wassermans allege that the Bank agreed to modify the contract and that that alleged oral agreement invalidates the contract and therefore the choice of law provision. As more thoroughly discussed later in this decision, the Court finds that neither the Guarantee nor the Agreement was so modified because they clearly and unambiguously provide that all modifications have to be in writing. (ECF No. 36 at ¶ 34.)

guage is ambiguous where it is "reasonably susceptible of different constructions." *Westinghouse Broad. Co., Inc. v. Dial Media, Inc.,* 122 R.I. 571, 410 A.2d 986, 991 (1980). In determining whether contract language is clear and unambiguous, a court should interpret "the parties' intent based solely on the written words," and give unambiguous words their "plain and natural meaning." *In Re: Newport Plaza Assocs.,* 985 F.2d at 645. Summary judgment is appropriate where "the words of a contract are so clear that 'reasonable people could not differ over their meaning.'" *Id.* (quoting *Boston Five Cents Sav. Bank v. Sec'y of Dep't of HUD,* 768 F.2d 5, 8 (1st Cir.1985)). Therefore, if the Court finds an ambiguity in the contract that creates a genuine issue of material fact, the Bank's summary judgment motion must be denied.

### 1. The Guarantee

Because the Wassermans failed to satisfy the deposit threshold to release the second tranche of the loan, the Guarantee was not released. (ECF No. 36 at ¶ 27.) The Guarantee agreed to by the Wassermans and the Bank is straightforward, thorough, clear, and unambiguous. The Wassermans agreed: (1) to "unconditionally and irrevocably guarantee ( ) payment or discharge ... of up to £9,500,000" plus default interest, fees, and costs of collection of debt of Hamilton Hall (Guarantee at §§ 1.1, 1.2, 6.1, 6.2, 7.1, 7.2, and 9.1); (2) to make payments on the Guarantee without set-off or counterclaim (*see* §§ 7.1(i), 9.1); (3) that any waiver or amendment to the Guarantee must be in writing and signed by the Wassermans and the Bank (Agreement § 31); (4) that no waiver by the Bank could be assumed even if the Bank made an effort to extend or compromise, acted, or made omissions in enforcing its interests, granted Hamilton Hall extra time, or made other concessions with it (ECF No. 36 at ¶ 48); and (5) that they could not assume the Bank waived any of its rights under the Guarantee if it failed to or delayed in exercising such rights. (*Id.* at ¶ 49.)

### 2. The Breach

The operative terms of the Guarantee are clear and unambiguous. In essence, the Bank agreed to loan Hamilton Hall money to finance the project in exchange for the Wassermans' personal promise to repay the Bank up to £9,500,000 to cover the loan to collateral deficiency. (*Id.* at ¶ 17.)

▉ In order to prevail on its breach of contract claim, the Bank must show that a debt is due and payable and that it has not been paid. *Wilson,* Scottish Law of Debt 2nd Ed. (1991) at ¶ 12.8. The Wassermans do not dispute the fact that Hamilton Hall did not meet the required £10,000,000 deposit threshold to release second tranche of the Loan, and that that failure constituted a default under sections 20.1.1, 20.1.2 and 20.2.2 of the Agreement. (ECF No. 36 at ¶ 27.) Because of this default, the Guarantee was not released. (*Id.*) The Wassermans also do not dispute that "Over the more than two years Hamilton Hall was in undisputed default, it: (1) discontinued payment of interest or fees on the Loan beginning and continuing from 2007, in contravention of Sections 8.4 and 2.2 of the Facility Agreement." (*Id.* at ¶ 32.) Based on these undisputed facts and the elements of breach of contract under Scottish law, the Court finds that Hamilton Hall breached the contract.

Despite these undisputed facts, however, the Wassermans argue that the language of the Guarantee and Agreement should be disregarded, or considered modified, in light of two alleged oral promises made between them and the Bank. It is on these two alleged promises that the Wassermans base their affirmative defenses of estoppel and waiver, duty to mitigate damages,

modification of agreement, and unjust enrichment.[6]

### 3. Affirmative Defenses

#### a. Estoppel, Waiver, and Modification of Agreement

The Court will address the Wassermans' affirmative defenses of estoppel, waiver, and modification of agreement at once because they are similar and complimentary. The Wassermans argue that the Bank is estopped from enforcing the Guarantee and/or has waived its rights thereunder because it alleges first, the Bank acted as though it agreed to allow the Wassermans to get out of the Hamilton Hall project and second, the Bank's agent told David Wasserman that it would not enforce the Guarantee if he agreed to refrain from exposing the Bank's alleged bad faith acts. (ECF No. 39 at 20–21, 23–24, 27–28.) The Wassermans allege that they relied on that benevolence to their detriment, making it unfair for the Bank to enforce the Guarantee. Moreover, the Wassermans argue that those oral promises modified the Guaranty, rendering it void and unenforceable. On the other hand, the Bank argues that the plain language of the contracts bar these defenses. (ECF No. 35–1 at 27–28.) The Bank argues that Guaranty § 7.1 and Agreement § 31 defeat these allegations because the Wassermans not only agreed that their payment obligations would not be reduced or mitigated by any act or omission by the Bank, but also that any change to the contracts had to be in writing. It is undisputed that the Guarantee was never modified.

▮ The Wassermans' argument fails. The Court has previously found that § 7.1 of the Guarantee unambiguously states that the Wassermans agreed that their payment obligations would not be reduced or mitigated. The Guarantee itself indicates that any extension, compromise, concession or delay in exercising any right or remedy would not waive the Bank's rights under the guarantee. (ECF No. 36 at ¶¶ 48–49.) There is no dispute that "The Facility Agreement provides at Section 31 that the Loan documents, including the Facility Agreement and the Security Documents, which includes the Guarantee, may only be amended or waived in writing made by the Bank and the other parties to the Loan documents." (*Id.* at ¶ 34.) The Wassermans have not submitted a subsequent amendment in writing of the Guarantee and the Bank asserts that there is none. (ECF No 35–1 at 8.) Moreover, the Wassermans do not dispute that the Bank expressly reserved its rights under the contract. (ECF No. 36 at ¶ 36.) In fact, they admit that David Wasserman testified that the Bank reserved its rights every time he spoke with it at the outset of every conversation. (*Id.*)

With regard to Ms. Smillie's alleged oral promise, the Court finds no competent evidence to support the existence of a promise. The only mention of this event in the record is David Wassermans' testimony about his communication with her, which the Court finds to be conclusory and devoid of necessary details. (ECF No. 41, Exh. C at 155.) When viewed in light of (1) Ms. Smillie's contradictory deposition testimony that the Bank made no such deal, (2) that she consistently made clear that the Bank reserved its rights under the Guarantee (ECF No. 45 at ¶¶ 146–148), (3) David Wasserman's own testimony that the Bank reserved its rights during every

---

**6.** As an initial matter, the Bank argues that sections 7.1 and 9.1 prohibit the Wassermans from asserting affirmative defenses and counterclaims. On the contrary, the Wassermans argue that the actual language of the Guaran-

tee does not support the Bank's argument. The Court agrees that the cited language, particularly in section 9.1, does not affect the Wassermans' right to bring proper defenses or counterclaims.

conversation, (ECF No. 36 at ¶ 36), and (4) David Wasserman's admission that he knew that the Bank could foreclose at any time after March of 2007 (*Id.* at ¶ 29), the Court finds the Wassermans' arguments on these defenses to be baseless and unsupported in fact and law. In light of these clear statements of the parties' positions, the Court finds that no oral promise could or did alter these terms. The Guarantee language remains binding and enforceable against the Wassermans. As such, the Court declines to credit the Wassermans' estoppel, waiver, and modification of agreement defenses.

### b. Duty to Mitigate Damages

The Wassermans argue that they have raised disputed issues of fact on the question of whether the Bank had a duty to mitigate its damages and whether it failed in that duty by rejecting the three prospective buyers the Wassermans presented. (ECF No. 39 at 22–23.) They assert that the Bank acted in bad faith in rejecting other deals with potential buyers that would have repaid the loan and even turned a profit. (*Id.*) The Bank counters that it had no duty to mitigate its damages under Scottish law and even if it did, the potential buyers were speculative at best. (ECF No. 35–1 at 15–16; ECF No. 44 at 21–22.)

■ The Court rejects this defense as well because there is no dispute that the parties did not amend the agreements to provide that the Bank was required in any way to accept an alternative buyer to the Wassermans. First, the Bank asserts that the Wassermans failed to raise a single, specific instance of bad faith or bad conduct in the record, but only generally allege that the Bank was unreasonable and

its rejection of the alternative buyers was unjustified. (*Id.*) The Court finds that it is immaterial whether the Bank did not properly consider any of the prospective buyers that the Wassermans brought forward. It was the Bank's prerogative to accept a buyer under its own terms or even to reject them out-of-hand. Even if the Court were to find that the Bank agreed to work with the Wassermans to broker a new deal, there is no evidence in this record that the Bank agreed to accept without qualification whichever new buyer or investor the Wassermans brought forward. The dispute over whether the Bank's rejection was unreasonable is not material to defeat summary judgment because the Bank's alleged unreasonable rejection of these potential buyers cannot be a defense to the Wassermans' breach—they breached the Agreement *before* any deal was presented and never negotiated for or received a written dispensation from the terms of the Guarantee.

Second, it is undisputed that a substitute deal was not close to being finalized such that any duty to mitigate, if real, could have been breached. David Wasserman acknowledged that a deal between the Bank and any of the three potential buyers was not imminent, as none of them had signed any final paperwork. (ECF No. 36 at ¶ 53.) Despite some equivocation, the Wassermans do not dispute the fact that none of the potential buyers presented a final deal (ECF No. 40 at ¶¶ 50, 52) and they admit, "the negotiations with Carmichael, Desmond and Trump never even reached a binding term sheet with Hamilton Hall." (ECF No. 36 at ¶ 53.)

Third, there is no evidence that any of the alternative buyers would have satisfied the loan without the Bank having to make other concessions that it was not willing to make. (*Id.* at ¶¶ 52, 56.)[7] In fact, they do

---

7. The Wassermans' argument that the Bank was unreasonable in rejecting offers that would have made a profit is based solely on one interrogatory answer from David Wasser-

man, which the Bank argues contained fictional numbers because the Wassermans were not able to provide the support for them when the Bank requested it. In short, the Bank

not dispute the fact that Bernard Wasserman sought advice about how to handle the $14 million loss the Wassermans would incur if the Desmond proposed deal were accepted, demonstrating that at least the Desmond alternative would certainly have not satisfied the Bank's financial terms. (*Id.* at ¶ 55.) The Court, based on the evidence, does not find the Wassermans' argument that the Bank was unreasonable in rejecting the deals to be credible and therefore finds that the Wassermans' duty to mitigate defense fails to raise a genuine issue of material fact.

### c. Unjust Enrichment

The Wassermans concede in their memorandum that their unjust enrichment allegations, styled as a counterclaim, should be considered as an affirmative defense. (ECF No. 39 at 15, n. 4.) The Wassermans argue that the Bank would be unjustly enriched if they were forced to pay under the Guarantee, effectively rewarding the Bank for its failure to accept one of the potential buyers, and for leading the Wassermans to believe that an alternate deal was possible. (ECF No. 39 at 31.) The Bank responds that the Wassermans cannot demonstrate that the Bank received a benefit from them—it is undisputed that Hamilton Hall, defaulted on the loan and the Wassermans have not paid on their pledge under the Guarantee. (ECF No. 44 at 26.) At most, it argues, the Wassermans are really contending that the Bank would be unjustly enriched if the Wassermans were ordered to pay under the Guarantee if it succeeds in this case. (*Id.*)

■ Under Scottish law, the Wassermans could only claim unjust enrichment as an affirmative defense if they had no contractual rights under the agreements.

*Dollar Land (Cumbernauld) Ltd v. CIN Properties Ltd.* 1998 S.C. (H.L.) 90. In other words, if there is a contract involved in a particular dispute, the aggrieved party cannot avail his or herself of the unjust enrichment defense. Because there is a contract in this case and the Court has found that the operative terms are clear and unambiguous such that the Guarantee's plain language governs, the Wassermans' unjust enrichment affirmative defense fails.

### d. Interference with Advantageous Business Relations

Lastly, the Wassermans argue that the Bank's rejection of the potential buyers, interfered with their personal business relationships without justification, and injured them and their business. (ECF No. 39 at 28.) The Wassermans assert that there is no explanation for the Bank's alleged interference with the formation of a new deal with one of these buyers other than actual intent to cause the Wassermans harm. (*Id.* at 30.) The Bank points out that the Wassermans' claim for interference with advantageous relations is not one recognized under Scottish law. (ECF No. 35-1 at 28.) The Bank nevertheless counters that there is no evidence that the Wassermans had any concrete expectation in a final deal with any of the potential buyers because there is likewise no evidence that any of these deals was anywhere near final. (*Id.* at 28–29.) The Bank also reiterates its point that the Wassermans point to no specific act of wrongdoing, other than a generic unreasonableness in dealing with the potential buyers, such that this claim must fail. (ECF No. 44 at 25–26.)

---

argues that this one piece of information is too speculative to raise a material issue of fact to overcome summary judgment. The Court agrees. Without an affidavit or the underlying figures, it is pure speculation for the Was-

sermans to allege that the alternative deals would have been profitable for the Bank or for the Wassermans. Wishful thinking, perhaps, but not based on facts in the record.

Interference with advantageous business relations is not recognized under Scottish law as an independent cause of action entitling the Wassermans to damages. Accordingly, this count must be dismissed as a counterclaim. Instead, the Court will treat it as a defense raised in the pleading. *See* Fed.R.Civ.P. 8(c)(2) (stating that a Court may "treat the pleading as though it were correctly designated"). The Court rejects this defense. There is no evidence in the record that the Bank had any contractual, explicit or implicit, obligation to take one of the deals that the Wassermans' personal business contacts offered. In order to show the Bank's unreasonableness, the Wassermans seem to rely on the fact that *they* believed the alternative proposals were suitable substitutes for the original agreements. *See supra* Section III.B.(3)(b) (citing undisputed facts that none of the potential deals were imminent and that the Wassermans acknowledged that they would take a loss if the Bank accepted the proposed Desmond deal). The Wassermans merely speculate that the Bank must have refused to work with their business colleagues out of spite. The Court cannot credit this sheer conjecture as a legitimate defense to the Bank's breach claims.

## C. The Wassermans' Counterclaims [8]

Because the Court has found that there are no disputed issues of material fact on the Bank's breach of contract and breach of guaranty claims and that none of the Wassermans' affirmative defenses are sufficient to defeat summary judgment, the question then becomes: have the Wassermans raised any issues of material fact in asserting their counterclaims such that the

Bank's summary judgment motion as to those counterclaims should be denied?

Citing the tiered ownership tree that the Wassermans created in their plan to acquire the Property, the Bank argues as an initial matter that the Wassermans lack standing to assert any counterclaims because these individual Defendants have no ownership interest in Hamilton Hall, the Property owner and borrower on the loan. (ECF No. 35–1 at 14.) The Wassermans counter that they have standing because their counterclaims are based on the Guarantee to which they are signatories. (ECF No. 39 at 25–26.) Practically, they also assert that, if the Court were to agree with the Bank on standing, they could amend the counterclaims to add the intervening entities and affect standing in that way. (*Id.* at 25, n. 8.)

The Court finds that the Wassermans have standing to bring their counterclaims. "In essence the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues." *Warth v. Seldin*, 422 U.S. 490, 498, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). In considering a plaintiff's standing, the Court must determine "whether the plaintiff has 'alleged such a personal stake in the outcome of the controversy' as to warrant his invocation of federal-court jurisdiction and to justify exercise of the court's remedial powers on his behalf." *Id.* at 498–99, 95 S.Ct. 2197 (quoting *Baker v. Carr*, 369 U.S. 186, 204, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962)). In this case, the Wassermans' counterclaims are rooted in their conduct and the Bank's conduct vis-à-vis the Guarantee. As signatories to a document that

---

**8.** It is unclear to the Court whether the issues the Wassermans styled as counterclaims are actually counterclaims or affirmative defenses, though it seems to the Court that these "counterclaims" are actually arguments against enforcement of the Guarantee. However, the Court need not decide this conflict at this time because the outcome would be the same under either categorization.

personally binds them to pay millions of pounds if they are not successful in defending in this suit, the Court finds that they have a personal stake in the outcome of this case sufficient to confer standing to pursue these claims.

### 1. Breach of the Covenant of Good Faith and Fair Dealing

The Wassermans allege that the evidence in the record supports (or at least raises a dispute concerning) the conclusion that the Bank breached the covenant of good faith and fair dealing by promising not to enforce the Guarantee and promising to work with them on a new buyer for the project and then breaking those promises by calling up the debt and selling the Property. (ECF No. 39 at 26–27.) The Bank counters initially that, under Scottish law, other than a general duty to act honestly as a banking institution, the Bank only had an obligation to act honestly at the time the Guarantee was signed. *House of Lords in Smith v. Bank of Scotland*, 1997 SC 111 at p. 118 C; *Braithwaite v. Bank of Scotland*, 1999 SLT 25 at p. 33 B/C; ECF No. 35–1 at 19–20. The Bank further asserts that the Wassermans have failed to cite any specific, disputed evidence that the Bank promised not to enforce the Guarantee in exchange for David Wasserman's promise for silence about the Bank's alleged wrongdoing to support this counterclaim. (ECF No. 44 at 24–25.)

■ The Bank does not dispute that it entertained the Wassermans' additional efforts to find an alternative buyer for the Property, but asserts that no suitable buyer was ready, willing, and able to meet the Bank's requirements. The dispute arises because the Wassermans argue that the buyers were suitable and ready to step in their place, but that the Bank sabotaged the deals. First, there is no evidence in the record, and the Wassermans have not brought forth any argument or evidence, that the Bank breached any duty of good faith at the inception of the agreement as Scottish law requires. In fact, the Wassermans never objected to the terms of the Guarantee when they had their Scottish representative sign it on their behalf. (ECF No. 36 at ¶ 42.) Second, the Court does not find anywhere in the extensive record before it that the Bank committed in writing, as the agreement and Guarantee required, to permit the Wassermans to substitute their choice of suitable back-up purchasers. Third, the undisputed evidence in the record belies the Wassermans' position that the Bank's alleged bad acts were responsible for the failed substitute deals. *See supra* Section B, 3(b) at 12–14. The Court therefore rejects the Wassermans' assertion and dismisses their counterclaim on the Bank's motion for summary judgment.

### 2. Misrepresentation

The Wassermans argue that the Bank made misrepresentations claiming that Ms. Smillie promised David Wasserman that the Bank would not enforce the Guarantee in exchange for his silence about the Bank's alleged bad acts. (ECF No. 39 at 28.) Second, they assert that the Bank agreed to consider other proposals to relieve the Wassermans' financial liability and that this agreement modified the contract. (*Id.* at 27–28.) The Bank argues that the Wassermans point to no evidence in the record to support their claim that the Bank made misrepresentations to them as they attempted to refinance or sell the Property. (ECF No. 35–1 at 24–25.) It further argues that this claim is implausible because there is no evidence of any specific misrepresentation or of any of the supposed unreasonable conditions the Bank allegedly imposed to sink the alternate deals. (*Id.* at 24.) The Bank highlights the fact that it only foreclosed after

the Wassermans failed to rework the deal over a period of two years. (*Id.*)

In order to state a claim for misrepresentation under Scottish law, the Wassermans must show that the Bank's words or conduct gave rise to their justifiable belief and they then acted based on that justifiable belief to their detriment. *Gatty v. Machine,* 1921 S.C. (H.L.) 1 at p. 7. The Bank focuses in their defense to this counterclaim on the concept of justifiable reliance and argues that even if the Wassermans convince the Court that the Bank did make misrepresentations, their reliance on those representations was not justified or reasonable because it was based on forward-looking, aspirational statements belied by the fact that the Bank continually reserved its right to foreclose under the contract. (ECF No. 35–1 at 25.)

The Court agrees that the Wassermans' misrepresentation defense does not raise any disputed issues of material fact such that the Bank's motion for summary judgment should not be granted. There is evidence in the record that the Bank agreed to work with the Wassermans to save the project and did work with them, at least to the extent that the Bank gave the Wassermans more time after their default to present an alternative deal. The crux of the Wassermans' misrepresentation argument is that the Bank did not work with them *enough* because it ultimately foreclosed on the Property and sold it at auction.

The Court finds no evidence in the record that the Bank agreed to defer foreclosure and enforcement of the Guarantee indefinitely pending the presentation of an appropriate substitute. In fact, the Wassermans' belief in this alleged promise is against the undisputed evidence in the record. The Wassermans entered into the Guarantee with the Bank, agreeing: (1) to "unconditionally and irrevocably guarantee () payment or discharge ... of up to £9,500,000" plus default interest, fees, and costs of collection of debt of Hamilton Hall (Guarantee at §§ 1.1, 1.2, 6.1, 6.2, 7.1, 7.2, and 9.1); (2) to make payments on the Guarantee without set-off or counterclaim (*see* §§ 7.1(i), 9.1); (3) that any waiver or amendment to the Guarantee must be in writing and signed by the Wassermans and the Bank (Agreement § 31); (4) that no waiver by the Bank could be assumed even if the Bank made an effort to extend or compromise, acted or made omissions in enforcing its interests, granted Hamilton Hall extra time or made other concessions with it (ECF No. 36 at ¶ 48); and (5) that they could not assume the Bank waived any of its rights under the Guarantee if it failed to or delayed in exercising such rights. (*Id.* at ¶ 49.) David Wasserman testified that he knew as of March 2007 the Bank could foreclose on the Property (*Id.* at ¶ 29) and that the Bank reserved its rights under the Guarantee during every conversation he had with it. (*Id.* at ¶ 36.)

Moreover, whether the Bank or Ms. Smillie told David Wasserman or any of the Wassermans that the Bank would try to salvage the deal or that it would not enforce the Guarantee against them is immaterial in the face of the plain language of the Agreement and Guarantee. If the Wassermans wanted to change the terms and had Ms. Smillie on board to do so, they knew how to do that—they are sophisticated businessmen with competent legal counsel who could have put the agreement in writing as required by § 31 of the Agreement. They never did and as such, the Wassermans' breach was clear and convincing. Any effort that the Bank and/or its employees made to save the deal by considering other offers was voluntary and not based on any contractual duty and any rejection of a potential deal does not turn those efforts into misrepresentations.

414

The Wassermans' final counterclaim therefore fails.

## IV. CONCLUSION

The Court declines to disregard and/or rewrite the terms of the Agreement or the Guarantee. The relevant material facts establishing a breach of the Agreement and Guarantee are undisputed. For the reasons articulated above, the Court therefore GRANTS the Bank's Motion for Summary Judgment as to its breach of contract and breach of Guarantee claims and as to the Wassermans' counter-claims. (ECF No. 35.)

The Plaintiff shall submit a form of judgment.

IT IS SO ORDERED.